**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-60233.

Bessie G. BRADLEY, et al., Plaintiffs-Appellants-Cross-Appellees,

v.

The ARMSTRONG RUBBER COMPANY (Now Pirelli Armstrong Tire Company) and Condere Corporation, d/b/a Fidelity Tire and Manufacturing Company, Defendants-Appellees-Cross-Appellants.

Dec. 17, 1997.

Appeals from the United States District Court for the Southern District of Mississippi.

Before REYNALDO G. GARZA, SMITH and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendant Armstrong Rubber Company ("Armstrong"), now Pirelli Armstrong Tire Company, operated a tire factory in Natchez, Mississippi, from 1937 to 1987. The plaintiffs lived in the neighborhood surrounding the factory and brought claims for trespass, nuisance, strict liability, and negligence, alleging that Armstrong blew carbon black onto their properties and introduced a plume of petroleum naphtha into the soil and water under their properties. The district court granted summary judgment for the defendants on most of these claims but allowed a claim for trespass to go to trial.

Plaintiffs appeal the summary judgment. We affirm the summary judgment on the strict liability and negligence claims and on the petroleum naphtha nuisance claims and reverse and remand on the air and particulate trespass and nuisance claims and on the petroleum

naphtha trespass claim.

Armstrong cross-appeals, claiming that the district court erred in refusing to grant summary judgment on the basis of *res judicata* against plaintiff Laura Hardin. Armstrong also seeks a new trial or judgment as a matter of law ("j.m.l.") on the ground that the evidence presented was insufficient to sustain the jury verdict. We reverse the denial of summary judgment against Laura Hardin and the denial of the motion for new trial.

## I.

### A.

In the course of its operations, Armstrong routinely released small amounts of a fine black powder known as "carbon black" into the air. Several times during 1990 to 1992, the Mississippi Department of Environmental Quality ("MDEQ") informed Armstrong that its carbon black emissions were above regulatory limits and that repairs were needed. According to the plaintiffs' expert real estate appraiser, Douglass Upchurch, Armstrong's release of carbon black has resulted in a layer of black powder on the plaintiffs' residences, making them appear dingy, dirty, and in need of paint. Armstrong claims that when its emissions of carbon black comply with MDEQ regulations, the amount released is negligible.

Plaintiffs have produced no witnesses who saw carbon black transmitted from the plant to the plaintiffs' property. The defendants admit, however, that the plant emits a small amount of carbon black, and MDEQ reports of substantial buildup of carbon black on plant property strongly suggest that significant additional amounts of carbon black were emitted in 1990 and 1992.

In addition, testimony of plant employees suggests that at other times as well, emissions might have been higher than the regulations allow.

The plaintiffs produced no expert testimony to prove that the substance on their properties was carbon black. MDEQ examined the properties and took samples of the black powder, but the record does not establish whether tests were conducted or, if so, what they revealed.[1] There is evidence that the neighborhood was industrial, containing, in addition to the tire plant, a pecan processing plant, a metal processing yard with open fires, and traffic created by large trucks.

The district court granted defendants' motion for summary judgment on the air particulate claims, holding "that carbon black is a chemical substance for which some expert testimony would be required to prove that a given substance is carbon black ..." and pointing out that the substance on the plaintiffs' property could have come from another source.

B.

The plaintiffs also bring claims for nuisance and trespass

_____

[1]Memoranda from MDEQ employees state that two samples were taken and delivered to a laboratory for testing but do not mention the results of either of these samples. One of the samples was taken by Ethyl Clark rather than by MDEQ employees. The collection method used for the other sample is not revealed.

One earlier memorandum discusses the results of a sample whose collection method and testing date is not revealed. This memo states only that "[s]amples taken at Mrs. Clark's house were not conclusion [*sic* ]." Several of the memoranda mention that samples could not be taken because there were not enough deposits, with homeowners mentioning that fallout had been lighter than usual and that recent rains had reduced the pollution.

resulting from the introduction of petroleum naphtha into the soil and water beneath their properties. Before 1989, an underground tank containing naphtha, a raw material similar to gasoline used in Armstrong's manufacturing process, developed a leak. Armstrong brought this problem to the attention of the MDEQ in 1989, after an environmental survey by a potential buyer of the plant discovered it, and MDEQ ordered Armstrong to remediate contamination in the ground water affected by the leak.

Armstrong agreed to complete the remediation. The time for cleanup is not known, in part because the planned remediation will affect only the water, not the surrounding soil, and the contaminated soil will contaminate the ground water. Expert testimony by Russell Smith of the MDEQ suggests that it will take at least ten years, perhaps twenty, to complete the remediation. Even when the remediation is complete, the chemicals released by the naphtha leak will not be completely removed.

The parties agree there is a slight chance that toxic elements in the soil could "volatilize," moving either up to the surface or down to the ground water and deeper soil. It is also possible that contaminated ground water eventually will reach drinking water.

The contamination of the water and soil does not currently affect the plaintiffs' use of their properties; the contamination is below the surface of their land and cannot be seen, smelled, or otherwise sensed. The plaintiffs offered no substantiation for their claims that the contamination interferes with their use and enjoyment of the property. The district court found baseless the plaintiffs' claims that their health has been adversely affected,

and the plaintiffs do not contest this finding.

C.

In addition to their claims for interference with use and enjoyment, the plaintiffs allege that the naphtha spill reduced the market value of their homes. Plaintiffs' expert, Upchurch, testified that after the naphtha spill, these homes had a negative market value, whereas before the spill their values ranged from $30,000 to $60,000.

On cross-examination, Upchurch was asked to explain his methodology. He stated that the first phase of appraisal of contaminated property is an estimation of the cost to clean up the contamination, the cost of monitoring, and the availability of financing, and that because these factors alone made the value of the properties negative, he "just stopped there." Also on cross-examination, Upchurch admitted that in his capacity as a broker, he would not advise a particular plaintiff whose home had originally been worth $60,000 to sell it for less than that, especially if he had a wife and children to support.

The plaintiffs and their expert also emphasized the existence of a requirement in Mississippi that homeowners disclose contamination on their properties to potential buyers. Both of the post-contamination buyers testified that, had the contamination been disclosed as required by law, they would not have bought their homes. Upchurch stated that potential buyers would be unable to get a mortgage for the property, concluding from this fact that there would be no market for the houses. He also suggested that, in addition, the homes would suffer from a phenomenon known as

"market stigma."

In addition to cross-examining the plaintiffs' expert appraiser, the defendants produced their own expert, Robert Haltom, who testified that each of the houses had increased in value since the naphtha leak. Haltom admitted on cross-examination, however, that the defendants' attorneys had instructed him to disregard the existence of contamination when drawing his conclusions, because "that's what this case is about."

## D.

This suit follows another proceeding related to the Armstrong tire plant, *Jackson v. The Armstrong Rubber Co.,* Civ. Ac. No. J90-129(B) (S.D.Miss.) (unpublished), which closely resembled this case and involved similarly situated plaintiffs and identical claims based on the naphtha leak. In *Jackson,* the court dismissed all claims by off-plume plaintiffs, allowing the claims of one on-plume plaintiff, Laura Hardin, to go to the jury. On the eve of trial, Hardin voluntarily dismissed her claim, and a final judgment dismissing with prejudice was entered in 1993.

Freddie Hardin, who was not a party to the 1990 *Jackson* suit, joined the instant suit, but died in 1994, and his wife, Laura Hardin, sues on his behalf. Freddie and Laura owned their property by a tenancy by the entirety. Freddie was fully aware of Laura's participation in the *Jackson* suit and cooperated by discussing details of the property with her expert appraiser (Upchurch, who provided identical testimony regarding the property in this suit). The defendants in the instant case unsuccessfully moved for summary judgment against her on the ground of *res judicata.*

The jury decided for the plaintiffs on the naphtha trespass claim.  It found that each of the houses had decreased in value by 75% because of the contamination.

## II.

### A.

We review a summary judgment *de novo.*  *See Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986).  After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *See Hanks,* 953 F.2d at 997.

We begin our determination by consulting the applicable substantive law to determine what facts and issues are material, then review the evidence relating to those issues, viewing the facts and inferences in the light most favorable to the non-movant. *See King v. Chide,* 974 F.2d 653, 655-56 (5th Cir.1992).  If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented.  *See Brothers v. Klevenhagen,* 28 F.3d 452, 455 (5th Cir.1994).

B.

If the plaintiffs could prove that the substance on their properties was carbon black, their case for causation would be strong enough for submission to the jury. Without compelling evidence from the defendants that the carbon black was more likely to have come from another source, we would allow the jury to infer causation from the closeness of the affected property to the source.[2] But because the plaintiffs have not produced such evidence, their case is weak, and the district court concluded that without expert testimony demonstrating that the substance was carbon black, the case could not go to trial.

Whether the air particulates on the plaintiffs' property are actually carbon black is, in itself, irrelevant. If the particulates are some other substance, but the substance came from the defendants and caused harm, the test for trespass is met, for there is no requirement that the particulates be a regulated substance such as carbon black.[3] Therefore, the question is whether the similarity of the substances may be considered by the jury in lieu of expert testimony demonstrating that the substance

---

[2]See *Shutes v. Platte Chem. Co.,* 564 So.2d 1382, 1384 (Miss.1990), in which the plaintiffs brought suit for nuisance and trespass against the only producer of the chemical linuron in the neighborhood and produced evidence of linuron damage to their properties. The court stated that "crumbs on the floor around the dining room table may be reasonably supposed to have fallen from the table." *Id.*

[3]See RESTATEMENT (SECOND) OF TORTS § 258-59, at 277-81 (1965) (noting that one is subject to liability for trespass when he intentionally causes "a thing" to enter land in the possession of another and that trespass may be committed on, beneath, or above the surface); *Alabama Great S.R.R. Co. v. Broach,* 238 Miss. 618, 119 So.2d 923 (1960) (holding that introduction of dirt onto land constitutes trespass).

on the homes is actually carbon black. Although the question is a close one, we conclude that the jury must be allowed to decide this material issue of fact.

In *Cooper Tire & Rubber Co. v. Johnston,* 234 Miss. 432, 106 So.2d 889 (1958), a rug cleaner sued a tire plant for nuisance and trespass arising from its emissions of carbon black. The defendants admitted causation; the opinion does not tell us what the defendant argued or what evidence the plaintiffs produced to obtain this admission. It says only that the carbon black-producing plant was located "not over 125 feet away" and that the defendants "necessarily concede that the trial court was warranted, on conflicting facts in finding that their plant constituted a nuisance for which they were liable in damages." *Id.* 106 So.2d at 891.

In the instant case, the plaintiffs' evidence presumably could have included expert testimony to the effect that the black powder on their residences was the same substance being produced by the tire plant. Instead, we have concessions by the defendants' employees to the fact that carbon black was produced and, if enough was produced with the wind blowing the right way, it probably would land on the plaintiffs' property.

Without an explanation why obtaining such evidence would be unduly costly or technologically infeasible, the plaintiffs' failure to produce stronger evidence that the substance was carbon black permits an inference that the plaintiffs have information to suggest it is *not* carbon black. On the other hand, plaintiffs' burden of proof at summary judgment should not require expert

testimony when observation of the available evidence might lead a reasonable person to conclude that the two substances, which look, smell and feel similar, are the same.

Unlike some substances, carbon black can be seen and touched. If scientific testing were not possible,[4] a jury could examine evidence about the physical properties of each material to decide whether the particulates on the plaintiffs' property, hypothetically, were in fact "crumbs" from the "table" of the defendants' plant. If, hypothetically, the plaintiffs offered testimony that the defendant was using yellow spray paint in the vicinity of their houses, and that their houses were now yellow, we would not require expert testimony in order for the plaintiffs to survive summary judgment. Instead, we would allow the plaintiffs to decide whether they thought the jury needed proof that the substance on the houses was yellow paint.

In concluding, from plaintiffs' failure to give scientific proof that the substance *was* carbon black, that they surely must have evidence that the substance was *not* carbon black, the district court improperly construed conflicting evidence in favor of the non-moving party. It is possible that the plaintiffs did not have the particulates tested because it was too expensive, or that carbon black is difficult to identify when combined with other substances that doubtless touched plaintiffs' property. Although there is a strong possibility that carbon black either is not present or is not a significant cause of the plaintiffs' dirty

---

[4]The record does not contain evidence about how easy it is to identify carbon black positively through scientific tests.

homes, that inference must be drawn by the jury after a trial, not by the district court on summary judgment, where all evidence must be interpreted favorably to the non-movant.

III.

A.

Plaintiffs argue that the summary judgment on their nuisance claims was improper, but they fail to explain how the existence of the naphtha plume under their properties interferes with their use and enjoyment of the properties. The summary judgment on the nuisance claims based on the naphtha leak is therefore affirmed. Because the district court did not consider whether the carbon black emissions interfered with the plaintiffs' use and enjoyment of their properties, the summary judgment with respect to the carbon black nuisance is reversed, and the issue is remanded for trial.

B.

Plaintiffs argue that "the same facts that establish the viability of [their] claims for trespass and nuisance demonstrate" that their claims for negligence and strict liability were sufficient to withstand summary judgment. They aver that whether the defendants acted reasonably was a question for the jury. The district court correctly noted the plaintiffs' failure to state a case on these issues.

Mississippi law requires participation in an ultrahazardous activity before strict liability can be imposed for harm from industrial operations. We have defined the concept of

"ultrahazardous activity" fairly narrowly.[5]  Plaintiffs offer no cases or evidence to support their position that defendants engaged in an ultrahazardous activity.  Finding no error, we affirm the summary judgment on this claim.

On the negligence claims, the plaintiffs failed to prove a duty owed to them, let alone a breach of such a duty.  A suit for negligence in Mississippi requires that a duty exist and be breached.[6]  The summary judgment on this issue is therefore affirmed.

IV.

A.

Defendants also argue that their motion for j.m.l. should have been granted on the ground that Upchurch's testimony was inadequate to provide the basis for a jury verdict.  They argue that the verdict was not supported by the evidence, because the expert testimony did not meet minimum standards.

We review the district court's decision *de novo,* applying the same standard used in deciding the motion for judgment notwithstanding the verdict, the substantial evidence standard of *Boeing Co. v. Shipman,* 411 F.2d 365, 374-75 (5th Cir.1969) (en banc).  If there is substantial evidence to support the verdict,

---

[5]See *Sprankle v. Bower Ammonia & Chem. Co.,* 824 F.2d 409, 414 (5th Cir.1987) (holding that storage of large quantities of anhydrous ammonia was not an ultrahazardous activity under Mississippi law where substance was poisonous only if inhaled in large concentrations and was commonly used in wide variety of agricultural, industrial, and commercial applications).

[6]*People's Bank & Trust Co. v. Cermack & Container Eng'g Corp.,* 658 So.2d 1352, 1360 (Miss.1995) (citing *May v. V.F.W. Post No. 2539,* 577 So.2d 372 (Miss.1991)).

the challenge to it must be denied. *Id.* at 374. "Substantial evidence" means evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions; a mere scintilla of evidence is insufficient. *Id.; see also Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1371 (5th Cir.1982).

B.

Defendants criticize the basis for Upchurch's expert testimony. On cross-examination, he stated that he considered the cost of cleanup in arriving at the negative value he attributed to the plaintiffs' properties after the naphtha leak. The defendants argue, *inter alia,* that because the testimony was based on an incorrect assumption that the property owners would be required to pay cleanup costs, it did not rest on a reliable foundation and was not relevant to the after-contamination value of the properties.

Although Upchurch mentioned several factors that might lower the value of the property even if the owners were not required to pay cleanup costs, the numbers he suggested were based on the erroneous assumption. Without those numbers, the jury was left with nothing but testimony to the effect that buyers would have difficulty getting financing and that the properties would suffer from "market stigma."

The phenomenon of "market stigma" is a reduction in market price caused by the public's fear of contaminated property, which lingers even after contamination has been remediated. Whether market stigma is a recoverable element of damages has been the subject of considerable debate.

In a strongly analogous case, the Third Circuit has held that, where a physical injury to land such as chemical contamination has occurred, damages for diminution in a property's value caused by market stigma may be recovered if the plaintiff can demonstrate that repairing the damage will not restore the property to its original market value. *See In re Paoli R.R. Yard P.C.B. Litig.,* 35 F.3d 717, 796-98 (3d Cir.1994). That case, like this one, involved chemical contamination of homeowners' properties, and remediation that was expected to reduce the contamination to levels not considered hazardous, but that would not eliminate the contamination completely. *Id.* at 795. The district court identified a tension between EPA standards—which suggested reducing the risk of cancer to ten times below the risk expected after remediation (from 1 in 100,000 to 1 in 1,000,000)—and FDA standards, which *allowed* similar levels of the chemical in food packaging, poultry, and animal feed.

The court held that this tension created a fact issue for the jury to resolve—whether there was a continuing health risk that could constitute "permanent injury," bringing the claim within the scope of Pennsylvania's traditional permanent injury requirement for diminution in value damages. *Id.* at 796. In the alternative, the court stated that the stigma itself could be a permanent injury, at least if some risk of further injury remained, where the stigma stemmed from an initial physical injury. *Id.* at 798. Unlike most courts considering the permanent/temporary injury distinction, the court held that the diminution in value itself was a permanent injury, rendering it unnecessary for plaintiffs to show

any permanent damage in the form of continuing health risks.

Several other courts, including the Mississippi Supreme Court, have suggested that stigma damages might be allowed as part of the diminution of value that may be recovered when a trespass or nuisance of a permanent nature physically injures the property. For instance, in *Leaf River Forest Prods., Inc.,* 662 So.2d 648, 664 (Miss.1995), the court held that "mere stigma, supported by tests showing dioxin contamination no closer than eighty river miles north of the alleged damage, is not sufficient evidence of compensable injury."

The court quoted extensively from *Berry v. Armstrong,* 989 F.2d 822 (5th Cir.1993), which involved alleged dumping of toxic wastes by the defendant in this case, Armstrong. Although Armstrong dumped waste material from its plant at various sites in the Natchez area, the plaintiffs could not demonstrate that this dumping had resulted in the presence of toxic chemicals on their property. Because the plaintiffs did not allege that the dumping occurred directly on their property, they could not show physical damage to it unless the waste disposal had resulted in hazardous chemicals being introduced to their land and groundwater. Upchurch, providing his expertise to the plaintiffs in that case as well, testified that the public perception of the presence of hazardous chemicals reduced the market value of the properties.

In *Berry,* we did not reject the plaintiffs' argument that a decrease in market value from stigma was compensable, but we stated that no Mississippi case "allows recovery for a decrease in property value caused by a public perception without accompanying

physical harm to the property." *Id.* at 829.[7]  Several courts have considered market stigma a relevant factor in determining the value of property for eminent domain and bankruptcy purposes.  In these cases, the issue is reducing the damages for a taking or reducing the value of property as collateral, but the same considerations apply, particularly in the eminent domain context.  All of these cases have held that market stigma may reduce the value of property.[8]

Because none of the Fifth Circuit or Mississippi cases involved fact patterns actually meeting this requirement, we are not bound to allow recovery for market stigma.  We are convinced, however, that Mississippi would allow recovery for diminution of value from market stigma under these circumstances.

Mississippi, like the states that have decided this issue, allows damages for diminution in value where permanent injury to property has occurred.[9]  Mississippi's policy of granting a remedy to property owners who have suffered an economic loss from a neighbor's trespass or nuisance would be thwarted by a rule holding that the plaintiffs' losses cannot be recovered.  The requirements

---

[7]*See also Adams v. Star Enter.,* 51 F.3d 417, 423 (4th Cir.1995) (applying Virginia law); *Adkins v. Thomas Solvent* Co., 440 Mich. 293, 487 N.W.2d 715, 727 (1992); *Santa Fe Partnership v. ARCO Prods. Co.,* 46 Cal.App.4th 967, 984, 54 Cal.Rptr.2d 214 (Cal. Ct.App.—2d Dist.1996) (no diminution in value where damages not permanent;  statute of limitations expired for claim of permanent injury);  *FDIC v. Jackson-Shaw Partners No. 46 Ltd.,* 850 F.Supp. 839, 844 (N.D.Cal.1994) (same).

[8]*See, e.g., Tennessee v. Brandon,* 898 S.W.2d 224, 227 (Tenn.Ct.App.1994);  *Florida Dept. of Transp. v. Finkelstein,* 629 So.2d 932, 934 (Fla. Ct.App.—4th Dist.1993).

[9]*See Phillips v. Davis Timber Co.,* 468 So.2d 72, 79 (1985); *Bynum v. Mandrel Indus.,* 241 So.2d 629, 634 (Miss.1970).

of permanent and physical injury to property ensure that this remedy does not open the floodgates of litigation by every property owner who believes that a neighbor's use will injure his property.

The requirements of permanent and physical injury are satisfied in this case. The petroleum naphtha physically entered the plaintiffs' properties and created a health hazard. Although the contamination is being remediated, the duration of the remediation is unknown, and the remediation will not completely remove the contamination. The MDEQ believes that remediation eventually will reduce the contamination to "safe" levels, but it has stated that it will not certify the properties' safety to potential purchasers, even after the remediation is completed.

C.

Nevertheless, we agree that plaintiffs failed to produce evidence sufficient to sustain the verdict. Convincing evidence of market stigma affecting the sale price and availability of financing for the properties may support damages for diminution in the value of permanently injured property. In this case, however, the plaintiffs' expert provided no estimate of the amount by which the value of the homes was reduced. His estimate of "after" value did not differentiate between the diminution resulting from the non-existent cost of cleanup, and the diminution caused by market stigma. Therefore, the jury's selection of a 75% reduction in value rested on no evidentiary foundation. Diminution of value damages, like all damages, must be proven with reasonable certainty

in Mississippi.[10]

Despite this, j.m.l. is inappropriate where, as here, some damage has been proven, and the plaintiffs' failure to offer sufficiently concrete testimony regarding damages was not entirely their fault. Although the defendants' primary criticism of Upchurch's testimony goes to its admissibility, they did not object to the testimony when it was given. Instead, they waited until their motion for j.m.l. to raise the issue. Had the defendants objected to the testimony's admissibility at trial, plaintiffs could have offered expert testimony based on the valid factors of market stigma, without the erroneous assumption regarding cost of cleanup. Such testimony could have supported a jury verdict.

As plaintiffs point out, the defendants never objected at trial to the qualifications of the witness or the admissibility of his testimony. Defendants argue that this is beside the point, because they do not object to the admissibility of the testimony, but to its qualification as the basis for a jury verdict. Defendants start out by characterizing their argument as one based on sufficiency of the evidence: "The movant does not have to establish that there is no evidence supporting the verdict, "but whether there is evidence upon which the jury properly could find a verdict for that party' " (*citing* 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2524, at 249 (2d ed.1995)).

Defendants also indirectly rely upon FED. R. EVID. 703 by

---

[10]*See, e.g., City of Jackson v. Keane,* 502 So.2d 1185, 1187 (Miss.1987); *Chevron Oil Co. v. Snellgrove,* 253 Miss. 356, 175 So.2d 471, 475 (1965); *Mississippi State Highway Comm'n v. Engell,* 251 Miss. 855, 171 So.2d 860, 862–63 (1965).

citing *Berry,* 989 F.2d at 827, which used rule 703 as the basis for excluding expert testimony in evaluating the evidence on motion for summary judgment. Defendants try to avoid using the term "inadmissible," but their objections to Upchurch's testimony (aside from the district court's irrelevant characterization of it as "ridiculous" and "unbelievable") are admissibility objections: The testimony "should be rejected since it does not rest on a reliable foundation and it is not relevant to the task at hand. It is based on speculation and conjecture." They then reprint excerpts of cross-examination that demonstrate that Upchurch based his opinion substantially on an incorrect assumption that the homeowners would be responsible for cleanup costs and monitoring, and otherwise neglected to follow the standard procedures in his profession.

Had the defendants objected to the admissibility of this evidence, their case would be strong. The record shows that defendants have admitted responsibility for all cleanup costs, that monitoring has been conducted by the MDEQ and Armstrong, not by homeowners, and that the district court considered costs of cleanup irrelevant to the question of damages. Thus, the probative value of Upchurch's "after" value was quite limited:

> Certainly nothing in Rule 703 requires a court to admit an opinion based on facts that are indisputably wrong. Even if rule 703 will not require the exclusion of such an unfounded opinion, general principles of relevance will. In other words, an opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant.

*Christophersen v. Allied-Signal Corp.,* 939 F.2d 1106, 1114 (5th Cir.1991) (en banc) (*overruled on other grounds, Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 587 n. 5, 113 S.Ct. 2786,

2793 n. 5, 125 L.Ed.2d 469 (1993)).[11] The defendants failed to make such an objection, however, and the testimony was admitted.

Because the defendants' claim that Upchurch's testimony did not meet rule 703's requirements is an admissibility objection, it should have been raised at trial. Defendants' counsel were present at the *in limine* hearing at which plaintiffs' counsel told the court that their expert would have to consider the cost of cleanup in performing his appraisal, so they had notice and time to prepare their objection.

Even if the defendants were not aware of the bases for the opinion before Upchurch's testified, they could have asked to have the testimony stricken from the record once its bases were revealed at trial. Instead, the defendants skillfully cross-examined Upchurch and hoped the jury would respond negatively to his "ridiculous" testimony. Defendants may not quietly let the inadmissible testimony enter the record, perhaps hoping it will work in their favor, and then obtain a j.m.l. on the basis of an untimely admissibility motion cloaked in the language of "sufficiency."

Defendants cite no case involving expert testimony failing rule 703's requirements in which a court granted j.m.l. without excluding the expert testimony (and hence implicitly finding it inadmissible). Rule 703's requirements are usually addressed at the summary judgment stage of a proceeding or on a motion to

---

[11]The same objection could and should have been made to the defendants' expert appraiser, who presented testimony regarding "before" and "after" values of plaintiffs' properties without considering the effect of contamination.

exclude evidence at trial.[12]

Once evidence—even if not admissible—is presented at trial, it must be considered for purposes of a j.m.l. if the affected party did not object properly.  The only panel in this circuit to review such a motion after the inclusion of inadmissible evidence held that the inadmissible evidence must be considered, stating that "[i]t was incumbent on the trial court to consider all of the evidence before the jury, as it was in fact presented to the jury...." *Sumitomo Bank v. Product Promotions, Inc.,* 717 F.2d 215, 218 (5th Cir.1983).  There, the proponents of the judgment objected to the evidence at trial, but the evidence was later revealed to be inadmissible on a different ground not mentioned in the party's original objection.

Here, defendants never objected to introduction of Upchurch's testimony on any ground.  Therefore, the evidence must be considered in weighing the evidence on motion for j.m.l.

Given that the jury probably based its verdict on testimony that was not only inadmissible, but also erroneous, it was error to let the verdict stand.  The appropriate remedy under these circumstances is a new trial, however, and not j.m.l.  The court has discretion to order a new trial rather than judgment as a matter of law when the defect in the nonmoving party's proof might

---

[12]See, e.g., *Berry,* 989 F.2d at 824; *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.,* 922 F.2d 220, 224-25 (5th Cir.1991) (rule 703 applied to evidence at summary judgment); *Ambrosini v. Labarraque,* 101 F.3d 129, 131 (D.C.Cir.1996) (same); *Guillory v. Domtar Indus., Inc.,* 95 F.3d 1320, 1329 (5th Cir.1996) (limiting testimony of witness at trial to testimony with reliable foundation).

be remedied at a second trial.[13]

Defendants' failure to make a timely objection deprived plaintiffs of effective notice that their expert's testimony did not meet rule 703's requirements. Had the defendants initially objected to the testimony of Upchurch on the basis of his erroneous assumptions, the plaintiffs could have asked him or another expert to focus solely on the market stigma aspect of damages. Such testimony would have been admissible and possibly sufficient to sustain a jury verdict. Accordingly, we remand for proceedings in which the plaintiffs may attempt to prove market stigma damages.

V.

A.

Prior to trial, the defendants filed a motion for partial summary judgment seeking the dismissal of the Hardin claims based on *res judicata.* The district court carried the motion with the case and denied it after the close of plaintiffs' case in chief, holding that because Freddie and Laura Hardin owned their home as tenants by the entirety, Laura had no authority to bring the *Jackson* suit without joining Freddie, so the judgment of dismissal in that suit was void.

The cases cited by the district court are not relevant. One, *Ayers v. Petro,* 417 So.2d 912 (Miss.1982), dealt with a woman's attempt to buy, at a foreclosure sale, the home she had previously owned, as joint tenant with right of survivorship, with her former

---

[13]See *Weade v. Dichmann, Wright & Pugh, Inc.,* 337 U.S. 801, 809, 69 S.Ct. 1326, 1330, 93 L.Ed. 1704 (1949); CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 2538 AT 357–59 (2d ed. 1995)

husband before their divorce.  The woman, who remained a joint cotenant with her husband in the property, was not permitted to purchase the property for her individual benefit.  *Id.* at 916.  The second, *In re Estate of Childress,* 588 So.2d 192 (Miss.1991), involved the question whether the signature of both parties is required to sever a tenancy by the entirety.

The defendants urge that we should look, instead, to the many cases holding that a person need not have title to real property in order to sue for trespass.  *See, e.g., Ingram-Day Lumber Co. v. Cuevas,* 104 Miss. 32, 61 So. 4, 5 (1913);  75 AM.JUR.2D *Trespass* § 38.  As long as the plaintiff was in actual possession of the land, she need not have had complete title to the property in order to maintain a valid suit.

Furthermore, as defendants also point out, the district court's fear that a rule permitting one party to bring suit would allow double recovery is unfounded.  As *Ayers* demonstrates, any recovery that one cotenant by the entirety obtains redounds to the benefit of the other.  This means the cotenant is in privity with the suitor, and would be barred from bringing a subsequent suit. *David v. Nemerofsky,* 41 A.2d 838 (D.C.1945).

Although no Mississippi case has considered this proposition, we find it highly unlikely that Mississippi would deny the privity of tenants by the entirety, thus allowing two suits for an injury to the same property.  Such a result would be inconsistent with principles followed throughout the country, and would result in grave injustice should a tenant by the entirety be abandoned by his cotenant.

In such a case, the statute of limitations might expire before the cotenant could be joined in the suit or the tenancy by the entirety abolished.  Furthermore, Mississippi law establishes that complete ownership is not required in a trespass case. Accordingly, the *Jackson* dismissal was not void merely because Freddie Hardin did not participate in the suit.

B.

Because the *Jackson* result stands, we must decide which claims, if any, have already been decided.  Federal law applies to the *res judicata* effect of a prior federal court judgment, and that law requires (1) identical parties, (2) jurisdiction for the prior judgment, (3) a final judgment on the merits, and (4) the same cause of action.  *Russell v. SunAmerica Sec., Inc.,* 962 F.2d 1169 (5th Cir.1992);  *Stovall v. Price Waterhouse,* 652 F.2d 537 (5th Cir. Unit A Aug.1981).

The only questionable requirements here are identical parties and same cause of action.  Parties in privity count as identical parties for federal *res judicata* purposes.[14]  Furthermore, the "same cause of action" test is easily met on the naphtha claims, because those claims were identical in the two suits.  The same expert appraiser was used, the same before and after property values were alleged, and the same relief was sought.  Thus, we reverse the denial of summary judgment and render partial summary judgment for the defendants on the Hardin naphtha claims.

---

[14]See *Russell,* 962 F.2d at 1173;  *United States v. Shanbaum,* 10 F.3d 305, 310 (5th Cir.1994);  *Gulf Island-IV, Inc. v. Blue Streak-Gulf,* 24 F.3d 743, 746 (5th Cir.1994), *cert. denied,* 513 U.S. 1155, 115 S.Ct. 1112, 130 L.Ed.2d 1076 (1995).

To the extent that Freddie Hardin alleged trespass or nuisance claims based on the carbon black emissions, however, those claims should survive summary judgment, as they were not brought in the original action and did not arise out of the same operative facts. With respect to these claims, we affirm the denial of summary judgment.

VI.

In accordance with the foregoing, the summary judgment for defendants on the trespass and nuisance claims is REVERSED. The denial of the motion for new trial is REVERSED. We REMAND for a trial on the air and particulate trespass and nuisance claims and for a new trial on the naphtha trespass claim. The summary judgment on the strict liability and negligence claims and on the petroleum naphtha trespass claim is AFFIRMED. The denial of summary judgment on the Hardin claims is REVERSED in part, and summary judgment is RENDERED on the Hardin naphtha trespass claims.