IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-8199
_____


HOLLYWOOD FANTASY
CORPORATION,

                                        Plaintiff - Appellee,

v.

ZSA ZSA GABOR,

                                        Defendant - Appellant.


_____

Appeal from the United States District Court
for the Western District of Texas
_____

August 12, 1998

Before KING and WIENER, Circuit Judges, and ROSENTHAL[*],

District Judge.

ROSENTHAL, District Judge:

        Appellee Hollywood Fantasy Corporation was briefly in the
business of providing "fantasy vacation" packages that would allow
participants to "make a movie" with a Hollywood personality and
imagine themselves movie stars, for one week, for a fee.  In May
1991, Hollywood Fantasy planned to offer its second fantasy
vacation package, in San Antonio, Texas.  Hollywood Fantasy

_____

    [*]     District Judge of the Southern District of Texas, sitting
by designation.

1

arranged to have Zsa Zsa Gabor as one of two celebrities at the event. Two weeks before the fantasy vacation event, Ms. Gabor cancelled her appearance. A short time later, Hollywood Fantasy cancelled the vacation event, to which it had sold only two tickets. A short time after that, Hollywood Fantasy went out of business.

Hollywood Fantasy sued Ms. Gabor for breach of contract and fraud. After the trial judge found that Ms. Gabor and Hollywood Fantasy had reached a contract, the jury found that Ms. Gabor had breached that contract. The jury awarded Hollywood Fantasy $100,000 for the breach, as well as $100,000 for fraud. The district court set aside the jury's fraud verdict for lack of evidence and entered judgment in favor of Hollywood Fantasy for $100,000 on the breach of contract claim, plus attorneys' fees and post-judgment interest. Ms. Gabor appealed.[1] We affirm the district court's judgment as to liability; reverse the district court's damages award; and render judgment for a lesser amount of damages.

## I.   The Facts as to Hollywood Fantasy

Leonard Saffir created Hollywood Fantasy and served as its chief executive officer. The company Mr. Saffir created charged each vacation "client" $7,500 for a week of "pampering,"

---

[1] After we heard oral argument in this case, Ms. Gabor filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Central District of California. The petition triggered an automatic stay of this appeal. On March 5, 1997, the bankruptcy court lifted the stay to permit the parties to litigate this appeal.

instruction on making movies, rehearsals, and a "starring" role in a short videotaped film with a "nationally known" television or movie star. Mr. Saffir hoped that "bloopers" and "outtakes" from the videotapes would ultimately become the basis for a television series. A new venture, Hollywood Fantasy had conducted only one vacation event before the package scheduled to take place in San Antonio in May 1991. The first event, held in Palm Springs, California, had received some media coverage, but had lost money.

This case began with a letter Hollywood Fantasy sent Zsa Zsa Gabor dated March 4, 1991. The letter opened with the following language:

> This will confirm our agreement whereby Hollywood Fantasy Corporation (HFC) will employ you under the following terms and conditions: . . .

The letter set out the terms and conditions of Ms. Gabor's appearance in fourteen numbered paragraphs. The terms and conditions specified the dates of employment; the hours of work; the duties required; the payment; and certain perquisites to be provided. The letter stated that Ms. Gabor was to be employed from May 2-4, 1991, in San Antonio, Texas; was to be "on call" from after breakfast until before dinner each day; was to act in videotaped "movie" scenes with the clients, using scripts and direction provided by Hollywood Fantasy, and was to join the clients for lunch and dinner; was to allow Hollywood Fantasy to use her name and photograph for publicity; and was to provide media interviews "as appropriate" during her stay in San Antonio. Hollywood Fantasy was to pay Ms. Gabor a $10,000 appearance fee and

$1,000 for miscellaneous expenses.  Hollywood Fantasy would also provide Ms. Gabor two first-class round-trip plane fares from Los Angeles; transportation to the Los Angeles airport and in San Antonio; hair and makeup services; meals; hotel expenses, excluding long distance telephone calls; and a hotel suite with "two bath rooms if available."

Ms. Gabor made three handwritten changes to this letter before signing and returning it to Mr. Saffir.  She inserted the word "one" into the sentence stating that she would make herself available for media interviews;  inserted the words "two bedroom" above the sentence describing the hotel suite that was to be provided in San Antonio; and added the words "wardrobe to be supplied by Neiman Marcus" to the paragraph outlining the perquisites.

The last paragraph of the terms and conditions provided an "out clause":

> [Hollywood Fantasy] agrees that if a significant acting opportunity in a film comes up [Gabor] will have the right to cancel [her] appearance in San Antonio by advising [Hollywood Fantasy] in writing by April 15, 1991.

The final paragraph of the letter stated: "Please sign a copy of this agreement and fax it to me . . . as soon as possible so we can proceed."  Ms. Gabor signed the letter in a signature blank above the words "Agreed and accepted," and sent it back to Leonard Saffir, who had already signed as the chief executive officer for Hollywood Fantasy.

On April 10, Ms. Gabor and Mr. Saffir talked by

4

telephone.  The parties differ as to the substance of that conversation.  Mr. Saffir asserts that they discussed the changes Ms. Gabor had made and "everything was agreed."  Ms. Gabor asserts that Mr. Saffir acted as if the original offer had been accepted.  The parties agree that Ms. Gabor sent Mr. Saffir a telegram dated April 15, 1991, stating:

> In accordance with the contract that exists between us the purpose of this telegram is to inform you that I must terminate it because I am due to be involved in preproduction and a promotion film for a motion picture I am contracted to do.  The name of the film is Queen of Justice produced by Metro Films of Los Angeles. . . . I am very sorry to cause you any discomfort but will be happy to try to help in supplying you with a replacement and hopefully we'll be able to do something together in the very near future.

Hollywood Fantasy unsuccessfully attempted to replace Ms. Gabor for the San Antonio event.  The San Antonio event was cancelled; the two ticket purchasers received their money back; Hollywood Fantasy went out of business; and this litigation began.

Ms. Gabor did not appear at the docket call scheduled for November 9, 1992.  Following a default judgment on liability and a jury trial on damages, the jury awarded Hollywood Fantasy $3,000,000.  The district court entered final judgment in that amount.  Ms. Gabor moved to set aside the judgment on the ground that she did not receive notice of the docket call.  The district court granted Ms. Gabor's motion to vacate the judgment and ordered a new trial.  After a second trial, the jury awarded Hollywood Fantasy $100,000 on its breach of contract claim and $100,000 on its fraud claim.  In a post-trial order entered February 8, 1993,

5

the district court set aside the jury's fraud verdict on the ground that Hollywood Fantasy had failed to show any fraudulent inducement or material misrepresentation. In the order, the district court found that a contract did exist between Ms. Gabor and Hollywood Fantasy, rejecting Ms. Gabor's argument that her handwritten changes to the March 4, 1991 letter materially modified and rejected Hollywood Fantasy's offer. The district court also upheld the jury's finding that Ms. Gabor's cancellation was not based on "a significant acting opportunity in a film," as the contract permitted. The district court entered judgment in favor of Hollywood Fantasy for $100,000, plus attorneys' fees and post-judgment interest. Ms. Gabor timely appealed.

Ms. Gabor asserts four grounds for appeal: (1) the parties did not reach a contract; (2) the jury's finding that Ms. Gabor did not effectively exercise the cancellation clause was against the weight of the evidence; (3) the jury's award of damages for breach of contract was not supported by competent evidence and was speculative; and (4) the district judge erred in failing to recuse himself before the second trial.

## II. The Contract Formation Issue

Under Texas law,[2] "[w]hen reviewing written negotiations, the question of whether an offer was accepted and a contract was formed is primarily a question of law for the court to decide." Scaife v. Associated Air Ctr. Inc., 100 F.3d 406, 410 (5th Cir. 1996) (citing S & A Marinas, Inc. v. Leonard Marine Corp., 875

---

[2] The parties agree that Texas substantive law applies.

6

S.W.2d 766, 769 (Tex. App. -- Austin 1994, writ denied)); see also Gilbert v. Pettiette, 838 S.W.2d 890, 893 (Tex. App. -- Houston [1st Dist.] 1992, no writ). We review questions of law de novo. Lubbock County Hosp. Dist. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 143 F.3d 239, 241-42 (5th Cir. 1998); Williamson v. Elf Aquitaine, Inc., 138 F.3d 546, 549 (5th Cir. 1998).[3]

The general rule is that "an acceptance must not change or qualify the terms of the offer. If it does, the offer is rejected." United Concrete Pipe Corp. v. Spin-Line Co., 430 S.W.2d 360, 364 (Tex. 1968); see generally E. ALLAN FARNSWORTH, 1 FARNSWORTH ON CONTRACTS § 3.21, at 259 (1990). Under this "mirror image" rule, a modification of an offer qualifies as a rejection and counteroffer only if the modification is "material." Hoyt R. Matise Co. v. Zurn, 754 F.2d 560, 566 (5th Cir. 1985); Gilbert, 838 S.W.2d at 893; MTrust Corp. N.A. v. LJH Corp., 837 S.W.2d 250, 254 (Tex. App. -- Fort Worth 1992, writ denied). Ms. Gabor asserts that by making the three handwritten changes to the March 4, 1991 letter, she rejected Hollywood Fantasy's offer and made a counteroffer, which Mr. Saffir did not accept before Ms. Gabor revoked it. Hollywood Fantasy asserts that the changes were not material and that Ms.

---

[3]     Hollywood Fantasy argues that Ms. Gabor waived her objection to enforcement of the contract by failing to plead it as an affirmative defense. In a diversity case, state law defines affirmative defenses that are waived if not timely pleaded. See, e.g., Davis v. Huskipower Outdoor Equip. Corp., 936 F.2d 193, 198 (5th Cir. 1991); Morgan Guar. Trust Co. of N.Y. v. Blum, 649 F.2d 342, 344 (5th Cir. Unit B 1981). Ms. Gabor's argument is that no contract was formed; she does not argue against enforcement of an existing contract. The argument is not in the nature of an affirmative defense under Texas law and Ms. Gabor did not waive it.

7

Gabor accepted the offer and entered into a contract, which she breached.

The cases in which courts find modifications to be material under Texas law generally involve significant increases in a party's financial obligation or exposure or in a party's duties under a proposed contract. In Gilbert, the defendants had employed the plaintiff as an expert witness in a toxic tort case. After the trial, the plaintiff sent the defendants a letter demanding payment of his expert witness fees. The defendants sent the plaintiff a check for the amount of the fees. On the back of the check, the defendants wrote that their endorsement "constitutes a full, final and complete release, indemnity, settlement and satisfaction" of all claims arising out of the trial. Gilbert, 838 S.W.2d at 892 (emphasis omitted). The court found this modification to be material because the defendant's indemnity condition "shifts the entire burden of loss from one party to another. . . . Requiring [the plaintiff] to indemnify [the defendants] for 'any and all claims' arising from the toxic tort case was a new and onerous condition on the original offer." Id. at 893 (citations omitted).

In Arguelles v. Kaplan, 736 S.W.2d 782 (Tex. App. -- Corpus Christi 1987, writ ref'd n.r.e.), the plaintiff prepared and sent a promissory note payable to the defendant, who increased the interest rate on the note and included a provision for entry of a consent judgment if the plaintiff defaulted. The court held that the defendant's modifications were material and that the response was not an acceptance but a counteroffer. Id. at 785. See also

8

Ferrero v. Amigo, Inc., 703 F. Supp. 890, 892 (D. Kan. 1988) (the plaintiff sent the defendant a letter seeking employment and listing a proposed annual base salary of $31,200; the defendant's reduction of the plaintiff's annual base salary to $30,000 was a modification to a material term of the offer); International Paper Co. v. Suwyn, 966 F. Supp. 246, 254 (S.D.N.Y. 1997) (an employee's memorandum in which he interpreted his noncompetition agreement to permit him to seek employment with companies that were proscribed under the agreement materially modified the agreement); Hullman v. Board of Trustees of Pratt Community College, 725 F. Supp. 1536, 1551-52 (D. Kan. 1989) (an employee's memorandum protesting his reassignment and refusing to waive a challenge to that reassignment contained a material modification to his employment contract), aff'd, 950 F.2d 665 (10th Cir. 1991).

Texas cases finding modifications not material generally involve changes that do not significantly alter the obligations or exposures under a contract. See, e.g., Zurn, 754 F.2d at 566 (a buyer's modification of a real estate contract to require the seller to provide the buyer with various documents six days earlier than originally stated was not a material modification; the change made the disputed provision consistent with other parts of the contract); United Concrete, 430 S.W.2d at 365 (holding that a change in a sales contract of the term "contract price" to "unit price" was not material because the modification "did not change the legal effect of the language"); MTrust Corp., 837 S.W.2d at 254 (the plaintiff's substitution of a "metes and bounds" description

9

of real property for a "cartographical" description of the property in a real estate contract was not a material modification).

Applying these criteria to the changes Ms. Gabor made before she signed and returned the March 4, 1991 letter leads us to affirm the district court's conclusion that the changes were not material. The changes did not significantly add to Hollywood Fantasy's financial obligation to Ms. Gabor or significantly reduce the duties she agreed to undertake during her appearance.

As set out in the March 4, 1991 letter, Ms. Gabor's obligations included appearing in San Antonio for three days, acting in scenes with the Hollywood Fantasy clients, and dining with the clients at lunch and dinner. Ms. Gabor was also obligated to allow Hollywood Fantasy to use her name and photograph for publicity and, with her permission, to use the videotaped scenes in which she appeared for publicity and a possible television pilot. Hollywood Fantasy's financial obligation to Ms. Gabor was a $10,000 appearance fee and $1,000 for miscellaneous expenses.

A separate paragraph listed benefits that Hollywood Fantasy would provide Ms. Gabor during her three days of employment. Ms. Gabor's addition of the words "two bedroom" to the hotel room provision, making it read "one hotel suite with two bedroom two bath rooms if available," did not materially alter Hollywood Fantasy's financial obligation to Ms. Gabor. In its letter, Hollywood Fantasy did not specify that the hotel suite was limited to one bedroom. Indeed, Mr. Saffir testified without contradiction that Hollywood Fantasy had already reserved the

10

hotel's "Presidential Suite" for Ms. Gabor.

Whether Ms. Gabor's addition of the sentence requiring a Neiman Marcus wardrobe for the fantasy vacation event materially modified Hollywood Fantasy's offer presents a closer question. However, the record leads this court to agree with the district judge that the change was not a material modification. Ms. Gabor bases her argument on her trial testimony that a Neiman Marcus wardrobe would have cost Hollywood Fantasy $8,000. A review of the trial record shows that Ms. Gabor's estimate was based on her assumption that she would be required to do "three shows a day" for three days, and would therefore need nine "wardrobe changes." Leonard Saffir testified that Hollywood Fantasy intended to film one scene with Ms. Gabor for each of the clients, so that she would need only one outfit. Although Ms. Gabor testified that she could not "make nine shows in the same outfit," she was not aware that Hollywood Fantasy intended to film her performing the same scene several times. Mr. Saffir testified that providing Ms. Gabor with one outfit from Neiman Marcus would have been "a simple thing to do."

The March 4, 1991 letter also stated that Ms. Gabor would make herself "available as appropriate for media interviews during the time [she was] in San Antonio." Ms. Gabor changed this sentence to read "one media interview." Ms. Gabor's limitation on media interviews was not a material modification to the terms of the proposed contract. Although Mr. Saffir had arranged for extensive media coverage, he testified that he did not view the

11

limitation on the number of interviews in San Antonio as a "problem" because "[k]nowing Miss Gabor from past experience, there was no way she was going to see a lot of press in San Antonio and only do one interview. . . . The last thing she would want to do is restrict herself from publicity coverage."  Mr. Saffir also testified that Ms. Gabor's participation in the San Antonio vacation package event would trigger the publicity he sought and that the number of media interviews she provided during her three-day stay was much less important to the event's success.

In the unusual factual context this record presents, we find that the modifications Ms. Gabor sought were not material because they did not significantly increase Hollywood Fantasy's financial obligations or significantly reduce Ms. Gabor's performance obligations under the March 4, 1991 letter.  This court also notes that to apply the mirror image rule in this factual context would lead to a result inconsistent with the purpose of that rule.  The rule requiring an acceptance to the terms of the original offer generally serves to protect the original offeror, the "master of the offer."  FARNSWORTH, 1 FARNSWORTH ON CONTRACTS § 3.13, at 229.  Texas cases generally apply the rule defensively, when an original offeror seeks to avoid more onerous demands sought by the offeree.  See, e.g., Gilbert, 838 S.W.2d at 892-93; MTrust, 837 S.W.2d at 254; Arguelles, 736 S.W.2d at 785.  In this case, by contrast, Ms. Gabor, the offeree, seeks to use the mirror image rule offensively, arguing that her own additional demands prevented the formation of a contract that she "cancelled" a short time

12

later.

It is particularly troubling to use the offeree's modifications as a basis for finding that no contract was formed when, as here, the original offeror agrees that the modifications became a part of the contract. The record leads this court to conclude that Hollywood Fantasy agreed to Ms. Gabor's additional demands.

To form a binding contract, "there must be a clear and definite acceptance of all terms contained in the offer." Engelman Irrigation Dist. v. Shields Bros., Inc., 960 S.W.2d 343, 352 (Tex. App. -- Corpus Christi 1997, petition for review filed). "[I]t must appear that the party to whom the offer is made accepts such offer and communicates such acceptance to the person making the offer." Id. "[T]he mode of expressing assent is inconsequential so long as it effectively makes known to the offeror that his offer has been accepted." Fujimoto v. Rio Grande Pickle Co., 414 F.2d 648, 652 (5th Cir. 1969). An offeree's acceptance of an offer may be inferred by his acts or conduct. See Hearthshire Braeswood Plaza Ltd. Partnership v. Bill Kelly Co., 849 S.W.2d 380, 392 (Tex. App. -- Houston [14th Dist.] 1993, writ denied) ("If one party signs, the other may accept by his acts, conduct or acquiescence in the terms of the contract."); Augusta Dev. Co. v. Fish Oil Well Servicing Co., 761 S.W.2d 538, 544 (Tex. App. -- Corpus Christi 1988, no writ); FARNSWORTH, 1 FARNSWORTH ON CONTRACTS § 3.13, at 226; RESTATEMENT (SECOND) OF CONTRACTS § 19(1) ("The manifestation of assent may be made wholly or partly by written or spoken words or by other

13

acts or by failure to act."); see also Karl Rove & Co. v. Thornburgh, 39 F.3d 1273, 1291 (5th Cir. 1994) (quoting the RESTATEMENT (SECOND) OF CONTRACTS § 19(2) for the rule that "[t]o manifest tacit assent to a contract through conduct, one must '[intend] to engage in the conduct and know[] or ha[ve] reason to know that the other party may infer from his conduct that he assents'").

The record supports the conclusion that Mr. Saffir reasonably conveyed to Ms. Gabor that Hollywood Fantasy agreed to her demands. Mr. Saffir telephoned Ms. Gabor on April 10, 1991 to "welcome her, to just go over some of the mechanics of what she was going to be doing . . . ." In the conversation, Mr. Saffir told Ms. Gabor that her demand for a Neiman Marcus wardrobe would be "no problem." There is no evidence that Mr. Saffir refused any of Ms. Gabor's handwritten changes to the March 4, 1991 letter. In the April 10 conversation, Ms. Gabor made some additional demands, including that she be allowed to bring her personal makeup artist with her to San Antonio. Mr. Saffir testified that at the end of that discussion, "everything was agreed." Even if Ms. Gabor's modifications were material and therefore a counteroffer to the March 4, 1991 offer, Hollywood Fantasy accepted that counteroffer before Ms. Gabor sent her cancellation notice.

Ms. Gabor's actions after that conversation made it clear that she, too, believed that a contract had been formed. On April 15, 1991, Mr. Saffir again telephoned Ms. Gabor to reaffirm the parties' agreement. Mr. Saffir testified that Ms. Gabor stated "I

14

could get a doctor's letter and get out of this contract if I want . . . ." The same day, Ms. Gabor sent Mr. Saffir a telegram exercising the "out clause" in the March 4, 1991 letter. Ms. Gabor wrote: "In accordance with the contract that exists between us . . . I must terminate it because I am due to be involved in preproduction and a promotional film." Mr. Saffir's telephone calls, Ms. Gabor's responses to the calls, and Ms. Gabor's April 15, 1991 telegram make it clear that Leonard Saffir effectively conveyed, and Zsa Zsa Gabor understood, that Hollywood Fantasy had accepted Ms. Gabor's demands and that the parties had reached a contract.

The district court correctly found that a binding contract existed between the parties.

## III. The Cancellation Provision

The contract permitted Ms. Gabor to cancel her appearance obligation by a certain date if a "significant acting opportunity in a film comes up." The jury found that Ms. Gabor had timely cancelled her appearance at the San Antonio event, but not because of a "significant acting opportunity." After the trial, Ms. Gabor moved for judgment as a matter of law under FED. R. CIV. P. 50(b), asserting that there was insufficient evidence to support the jury's finding. The trial court denied Ms. Gabor's motion. Ms. Gabor renews her objection here. We review the district court's denial of a motion for judgment as a matter of law de novo. Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1040 (5th Cir. 1998); Nichols v. Lewis Grocer, 138 F.3d 563, 565 (5th Cir. 1998). "If

15

there is substantial evidence to support the verdict, the challenge to it must be denied. . . . 'Substantial evidence' means evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions; a mere scintilla of evidence is insufficient." Bradley v. Armstrong Rubber Co., 130 F.3d 168, 174 (5th Cir. 1997) (citing Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc)).

In her April 15, 1991 telegram to Mr. Saffir, Ms. Gabor stated that she was scheduled to be in "preproduction and a promotional film for a motion picture I am contracted to do" called Queen of Justice. At trial, Ms. Gabor testified that on April 15, she had "offers" to act in both Queen of Justice and a movie called Naked Gun 2½ on the dates of the San Antonio event.

Ms. Gabor and Richard Heard, who referred Hollywood Fantasy to Ms. Gabor, testified that Queen of Justice was a significant acting opportunity because Ms. Gabor would have had an important role in the movie. However, undisputed testimony established that Ms. Gabor was not involved in any activity relating to Queen of Justice during the three days she was scheduled to be in San Antonio working for Hollywood Fantasy. Ms. Gabor did film a part in Naked Gun 2½ during those three days. However, undisputed testimony established that Ms. Gabor's role in Naked Gun 2½ consisted of a fourteen-second cameo during the opening credits. Ms. Gabor testified that her appearance in Naked Gun 2½ was a significant acting opportunity because she received

16

positive reviews for the cameo.  Richard Heard testified that <u>Naked Gun 2½</u> was a significant opportunity for Ms. Gabor because "it was a wonderful opportunity to introduce her to a different audience that she doesn't have now."  Mr. Saffir testified that he did not consider Ms. Gabor's part in <u>Naked Gun 2½</u> to be a "significant acting opportunity" under the contract because her role was a fourteen-second cameo role during the opening credits. The jury saw this portion of <u>Naked Gun 2½</u> and concluded that Ms. Gabor had not cancelled her San Antonio obligation on the basis of a "significant acting opportunity."

Ms. Gabor argues that the trial court erred in permitting Mr. Saffir to testify as to whether Ms. Gabor's role in <u>Naked Gun 2½</u> was a significant acting opportunity because Mr. Saffir was not a "movie industry" expert qualified to give such an opinion.  At trial, Ms. Gabor's counsel objected to Mr. Saffir's testimony only on the basis that there was "no foundation" for the testimony.  Ms. Gabor did not object that the question called for an expert opinion from an unqualified witness.  Nor did Ms. Gabor seek to offer herself or Heard as experts on what constituted a "significant acting opportunity."

We review the trial court's evidentiary rulings for abuse of discretion.  <u>Snyder v. Trepagnier</u>, 142 F.3d 791, 801 (5th Cir. 1998); <u>Snap-Drape, Inc. v. Commissioner of Internal Revenue</u>, 98 F.3d 194, 197 (5th Cir. 1996); <u>Eiland v. Westinghouse Elec. Corp.</u>, 58 F.3d 176, 180 (5th Cir. 1995).  Rule 701 of the Federal Rules of Evidence states in pertinent part:

17

> [T]he witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

FED. R. EVID. 701.

Mr. Saffir testified that he had extensive experience in public relations and in television production. Mr. Saffir also had experience in negotiating with film actors. Mr. Saffir himself drafted the March 4, 1991 letter containing the language at issue. Mr. Saffir's testimony was "helpful to a clear understanding" of whether Ms. Gabor had a "significant acting opportunity" that conflicted with her San Antonio appearance obligation. The trial court did not abuse its discretion in allowing Mr. Saffir to present the testimony at issue.

Even without Mr. Saffir's testimony, substantial evidence supported the jury's determination that Ms. Gabor did not cancel the contract because of a significant acting opportunity. Ms. Gabor testified at trial that she had contracted to do Naked Gun 2½ on or before April 15, 1991. However, plaintiff's counsel impeached Ms. Gabor with her deposition, in which she testified that she did not know on April 15, 1991 whether she had a contract to appear in a cameo role in Naked Gun 2½. In addition, Ms. Gabor's role in Naked Gun 2½ was a fourteen-second cameo appearance during the credits. The jurors viewed the relevant part of the film. The jury had a sufficient evidentiary basis to conclude that this part was not a "significant acting opportunity in a film."

18

There was also substantial evidence that <u>Queen of Justice</u> did not present Ms. Gabor with a significant acting opportunity. Mr. Saffir testified that he had never heard of <u>Queen of Justice</u>; that no money had been raised to produce this film; and that this film had no preproduction or production work scheduled on April 15, 1991 or in May 1991. Ms. Gabor testified that <u>Queen of Justice</u> was never made. Ms. Gabor never signed a contract to make <u>Queen of Justice</u> and never did any preproduction or other work for the film. Although her April 15, 1991 telegram stated that she was to do "promotional work" for <u>Queen of Justice</u>, Ms. Gabor testified at trial that she did not even know what "promotional work" she was referring to in the telegram. The evidence showed that Ms. Gabor was not committed to work in <u>Queen of Justice</u> that would conflict with her Hollywood Fantasy appearance when she cancelled that appearance.

Substantial evidence existed to support the jury's finding that Ms. Gabor did not cancel the contract because of a significant acting opportunity. The trial court properly denied Ms. Gabor's motion for judgment as a matter of law under FED. R. CIV. P. 50(b).

## IV. The Evidence on Damages

At trial, Ms. Gabor moved for judgment as a matter of law that there was insufficient evidence to support the jury's award of $100,000 for breach of contract. The district court denied Ms. Gabor's motion. Ms. Gabor renews her objection here.

"In a federal case involving a state law claim, state law

19

determines the kind of evidence that may be produced to support a verdict, but federal law establishes the quantum of evidence needed to support a verdict." Parham v. Carrier Corp., 9 F.3d 383, 386 (5th Cir. 1993) (citations omitted); see also Jones v. Wal-Mart Stores, Inc., 870 F.2d 982, 986 (5th Cir. 1989). This court will uphold the district court's denial of a challenge to the sufficiency of the evidence if there is substantial evidence to support the jury's verdict. Bradley, 130 F.3d at 174.

"It is a general rule that the victim of a breach of contract should be restored to the position he would have been in had the contract been performed." Mistletoe Express Serv. of Okla. City, Okla. v. Locke, 762 S.W.2d 637, 638 (Tex. App. -- Texarkana 1988, no writ); see also General Resources Org., Inc. v. Deadman, 907 S.W.2d 22, 32 (Tex. App. -- San Antonio 1995, writ denied); Sassen v. Tanglegrove Townhouse Condominium Ass'n, 877 S.W.2d 489, 493 (Tex. App. -- Texarkana 1994, writ denied); General Elec. Supply Co. v. Gulf Electroquip, Inc., 857 S.W.2d 591, 599 (Tex. App. -- Houston [1st Dist.] 1993, writ denied). "However, an injured party may, if he so chooses, ignore the element of profits and recover as damages his expenditures in reliance." Nelson v. Data Terminal Sys., Inc., 762 S.W.2d 744, 748 (Tex. App. -- San Antonio 1988, writ denied) (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 347, 349); see also FARNSWORTH, 3 FARNSWORTH ON CONTRACTS § 12.16, at 262.

The $100,000 damages award cannot be supported as the recovery of lost profits. Mr. Saffir testified that Hollywood

Fantasy lost $250,000 in profits from future fantasy vacation events and at least $1,000,000 in future profits from the creation of a television series based on "bloopers" and "outtakes" from the videotapes of clients "acting" with Hollywood personalities. Although "[r]ecovery of lost profits does not require that the loss be susceptible to exact calculation," Szczepanik v. First Southern Trust Co., 883 S.W.2d 648, 649 (Tex. 1994), lost profits must be proved with "reasonable certainty." Texas Instruments, Inc. v. Teletron Energy Management, Inc., 877 S.W.2d 276, 279 (Tex. 1994). "[A] party claiming injury from lost profits need not produce in court the documents that support his opinions or estimates." Ishin Speed Sport, Inc. v. Rutherford, 933 S.W.2d 343, 351 (Tex. App. -- Fort Worth 1996, no writ). A witness may testify "from personal knowledge as to what profits would have been." Naegeli Transp. v. Gulf Electroquip, Inc., 853 S.W.2d 737, 740 (Tex. App. -- Houston [14th Dist.] 1993, writ denied). However, "[a]t a minimum, opinions or estimates of lost profits must be based on objective facts, figures or data from which the amount of lost profits may be ascertained." Szczepanik, 883 S.W.2d at 649; see also Ishin Speed Sport, 933 S.W.2d at 350. "Mere speculation" of the amount of lost profits is insufficient. Thedford v. Missouri Pac. R.R. Co., 929 S.W.2d 39, 47 (Tex. App. -- Corpus Christi 1996, writ denied) (citing Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 85 (Tex. 1992)).

Leonard Saffir's testimony that Hollywood Fantasy lost $250,000 in future profits was based on his estimate that Hollywood

Fantasy would make a $25,000 profit from each of ten future events. Hollywood Fantasy was a new venture. It had put on one event, in which nine people participated, and in which it had lost money. Two weeks before the San Antonio event, only two people had bought tickets for the event. Hollywood Fantasy had no commitments to, or arrangements for, specific future events. "Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, . . . or on the success of a new and unproven enterprise, cannot be recovered." Texas Instruments, 877 S.W.2d at 279 (emphasis added). "The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits." Id. at 280. In Texas Instruments, the Texas Supreme Court made it clear that the relevant "enterprise" in the lost profits inquiry is "not the business entity, but the activity which is alleged to have been damaged." Id. (emphasis in original). There was no evidence at trial that the "movie fantasy vacation" enterprise promoted by Hollywood Fantasy had been a successful enterprise in any context. There was no evidence that the Hollywood Fantasy management had ever been involved in any prior fantasy vacation enterprise, let alone a successful one. See id. ("The focus is on the experience of the persons involved in the enterprise and the nature of the business activity, and the relevant market."); Ishin Speed Sport, 933 S.W.2d at 351.

In Texas Instruments, the Texas Supreme Court stated that even a new enterprise may attempt to recover lost profits when

22

there are "firmer reasons" to "expect [the] business to yield a profit." Texas Instruments, 877 S.W.2d at 280; see also Hiller v. Manufacturers Prod. Research Group of N. Am., Inc., 59 F.3d 1514, 1521 (5th Cir. 1995); National Union Fire Ins. Co. of Pittsburgh, Pa. v. Insurance Co. of N. Am., 955 S.W.2d 120, 131 (Tex. App. -- Houston [14th Dist.] 1997, writ denied). There was no evidence at trial that Hollywood Fantasy had "firm" reasons to expect a profit. Nine participants attended the Palm Springs event; not all of those participants paid the full $7,500 price of admission and only "some" of the Hollywood Fantasy employees were paid for their work. As of April 15, 1991, two weeks before the San Antonio event, only two tickets had been sold. Mr. Saffir's testimony that he still expected twenty participants was based on the optimistic but unsupported assertion that people generally "don't send in their money right away."

Hollywood Fantasy's claim for loss of television revenue is even more speculative. Mr. Saffir admitted that he had not sold a television pilot, let alone a series, based on the fantasy vacation videotapes. Mr. Saffir testified that the actors appearing in the videotapes could have unilaterally declined to permit Hollywood Fantasy to use the tapes in a television pilot. Mr. Saffir testified that unidentified producers and others were enthusiastic about the "concept" of such a television series, but he had difficulty even estimating what the profits from a series might be. No "objective facts, figures, or data" substantiated the estimate of lost profits.

23

Hollywood Fantasy's claims for lost profits also fail because there was no evidence of how Hollywood Fantasy estimated the profits or what data it used to do so. See National Union Fire, 955 S.W.2d at 132 (noting that lost profits may be recovered "if factual data is available to furnish a sound basis for computing probable losses"); Thedford, 929 S.W.2d at 49 ("[T]estimony about lost profits must at least be based upon some factual data."); Szczepanik, 883 S.W.2d at 650; Holt Atherton, 835 S.W.2d at 84.

Mr. Saffir also testified that Hollywood Fantasy lost $200,000 in "goodwill." Under Texas law, the loss of goodwill or business reputation is not recoverable in a breach of contract action. See, e.g., Rubalcaba v. Pacific/Atlantic Crop Exch., Inc., 952 S.W.2d 552, 558 (Tex. App. -- El Paso 1997, no writ); Nelson, 762 S.W.2d at 748.

Hollywood Fantasy also seeks to support the damages awarded as based on evidence of lost investment in the corporation. Mr. Saffir testified that Hollywood Fantasy lost $200,000 that had been invested in the corporation. Under Texas law, "actual damages may be recovered when loss is the natural, probable, and foreseeable consequence of the defendant's conduct." Mead v. Johnson Group, Inc., 615 S.W.2d 685, 687 (Tex. 1981). The record must contain evidence that permits the jury "to assess with reasonable certainty the . . . degree of causation of the damage by the breach or interference relative to other factors." University Computing Co. v. Management Science Am., Inc., 810 F.2d 1395, 1398

24

(5th Cir. 1987). It is pure speculation that but for Ms. Gabor's breach, Hollywood Fantasy would not have gone out of business. Hollywood Fantasy had lost money on the Palm Springs event despite the fact that it had not charged the full fee to several participants and had not paid all of its employees. Hollywood Fantasy had sold only two tickets to the San Antonio event. Hollywood Fantasy is not entitled to an award of damages representing a return of $200,000 invested in the corporation.

Although Hollywood Fantasy did not present evidence to base an award of compensatory damages on either lost profits or lost investment, it did present sufficient evidence as to certain out-of-pocket expenses to justify their recovery. Mr. Saffir testified that Hollywood Fantasy incurred the following out-of-pocket expenses for the San Antonio event: (1) $8,500 in printing costs for color brochures and press releases; (2) $12,000 in marketing costs for mailings and advertising; (3) $22,000 in personnel and miscellaneous expenses, including air fares, staff accommodations, script-writing costs, telephone calls, and logo t-shirts; (4) $9,000 in travel expenses for Mr. Saffir and members of the Hollywood Fantasy "staff," including Margo Mayor, Hollywood Fantasy's president; and (5) $6,000 in expenses relating to preparations to film the San Antonio event for a possible television pilot. These expenses total $57,500.[4]

---

[4] The general rule is that the nonbreaching party may only recover out-of-pocket expenses incurred after the contract was formed. See, e.g., Autotrol Corp. v. Continental Water Sys. Corp., 918 F.2d 689, 695 (7th Cir. 1990) (applying Texas law); Hough v. Jay-Dee Realty & Inv., Inc., 401 S.W.2d 545, 551 (Mo. Ct. App.

Ms. Gabor objects that this evidence cannot form the basis of a damages award because Mr. Saffir testified that there were documents relating to a few of these expenses, but did not produce any documents at trial. However, the Texas cases Ms. Gabor cites to support her argument do not hold that documentary evidence is required for the recovery of out-of-pocket expenses. In <u>Black Lake Pipe Line Co. v. Union Constr. Co.</u>, 538 S.W.2d 80 (Tex. 1976), the plaintiff attempted to prove damages by introducing summaries of records. The court held that the summaries were inadmissible hearsay because the plaintiffs had failed to make the underlying records available to the defense. <u>Id.</u> at 92-94. The court's holding was based on the plaintiff's failure to comply with the rules governing the admissibility of summaries of voluminous underlying information. <u>Id.</u> at 93-94. The court did not hold that the summaries were inadmissible because they were not the "best evidence" of damages. Nor did the court hold that oral testimony regarding damages, if based on sources other than the flawed summaries themselves, would have been inadmissible. <u>Id.</u> at 94.

Ms. Gabor also cites <u>Gulf Coast Inv. Corp. v. Rothman</u>, 506 S.W.2d 856 (Tex. 1974). In <u>Rothman</u>, the plaintiff stipulated during trial the amount of damages he had suffered from the defendant's breach of contract, without providing the basis for his

1966); <u>see also</u> 3 FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.16, at 262-63 n.2; Gregory S. Crespi, <u>Recovering Pre-Contractual Expenditures as an Element of Reliance Damages</u>, 49 SMU L. REV. 43, 44 (1995). Saffir's testimony does not make it clear whether each of these expenses were incurred after Ms. Gabor returned the March 4, 1991 letter. However, Ms. Gabor does not challenge the jury's award on this ground.

26

damages figure. The trial court found that although the defendant breached the contract, the plaintiff had not proved that he sustained any damages. The plaintiff appealed. The plaintiff argued that he was not required to show the "exact" amount of damages he had suffered. Id. at 858. The Texas Supreme Court affirmed the trial court, holding that the plaintiff had failed to show any basis for an award of damages. Although the plaintiff did not have to show his "exact" damages, this rule "did not mean that a guess or surmise on the part of the jury would suffice." Id. "While mathematical precision is not required to establish the extent or amount of one's damages, one must bring forward the best evidence of the damage of which the situation admits, and there must be some basis for reasonable inferences." Id. (citing C. McCORMICK, THE LAW OF DAMAGES §§ 26, 27 (1935)).

Although Rothman stated that a plaintiff must provide the "best evidence" of damages, the Texas Supreme Court used this term in the context of examining the requirement that a plaintiff must provide a basis for estimating damages sought. Rothman does not prevent the admission of oral testimony as evidence of damages, even when the oral testimony is based on documentary evidence. See, e.g., Vance v. My Apartment Steak House of San Antonio, Inc., 677 S.W.2d 480, 483 (Tex. 1984) (noting that a witness's oral testimony was "competent evidence" of damages for breach of contract, without mentioning the need for production of supporting documentation); cf. Holt Atherton, 835 S.W.2d at 84 (noting that oral testimony alone may be sufficient to establish lost profits without the

27

production of supporting documentation); <u>Pena v. Ludwig</u>, 766 S.W.2d 298, 304 (Tex. App. -- Waco 1989, no writ) (stating in the context of recovering damages for lost profits that "[t]his court has not found any blanket requirement that a witness' testimony, which is based on first-hand knowledge of financial data, must be supplemented in every instance by the financial records from which actual knowledge is gained").

Ms. Gabor presented no evidence controverting Mr. Saffir's testimony as to Hollywood Fantasy's lost out-of-pocket expenses for the San Antonio event. Mr. Saffir's testimony as to Hollywood Fantasy's out-of-pocket expenses is sufficient to support an award of $57,500 for breach of contract, but not to support an award of $100,000.[5] The award of $100,000 is reversed in part on the basis that the evidence disclosed in the record does not support compensatory damages beyond $57,500.

## V.    The District Judge's Failure to Recuse

Ms. Gabor finally argues that the district judge should have recused himself because he was biased against her. The obligation to recuse is governed by 28 U.S.C. § 455, which states in pertinent part:

> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might

---

[5]    Hollywood Fantasy cannot recover the $15,000 it refunded to the two individuals who had bought tickets to the San Antonio event before it was cancelled. The ticket price refund was not an out-of-pocket expense. Hollywood Fantasy presented no testimony as to what portion, if any, of this amount it would have kept as profit had the event gone forward with Ms. Gabor's participation.

28

reasonably be questioned.

> (b) He shall also disqualify himself in the following circumstances:
>
>> (1) Where he has a personal bias or prejudice concerning a party . . . .

28 U.S.C. §§ 455(a)-(b)(1).

Ms. Gabor's argument is frivolous.  Ms. Gabor asserts that the district judge's remarks criticizing her after she failed to appear at the first trial reveal bias against her.  A review of the remarks do not show bias warranting recusal.[6]  Ms. Gabor asserts that the bias manifested itself when the trial judge allowed counsel for Hollywood Fantasy to ask Mr. Saffir a leading question and when the judge made an evidentiary ruling against her. Ms. Gabor ignores the fact that after she demonstrated that she did

---

[6]    The United States Supreme Court has stated:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

Liteky v. United States, 114 S. Ct. 1147, 1157 (1994).  The Court noted that "remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."  Id.  The district court's comment to the first jury and isolated comment to the media do not display a "deep-seated favoritism or antagonism" that "would make fair judgment impossible."  At most, the comments revealed the district judge's temporary frustration with a defendant who he perceived to have ignored her trial.  When Ms. Gabor argued that she had not had notice of the trial, the district judge granted Ms. Gabor's motion for a new trial and set aside the default judgment of $3,000,000.

29

not receive notice of the first trial setting, the judge set aside the $3,000,000 default judgment and ordered a new trial. Ms. Gabor also ignores the fact that at the conclusion of the second trial, the judge set aside the jury's finding of fraud. A review of the record, including the evidentiary rulings, reveals no bias.

Ms. Gabor's argument is also untimely. Despite her assertion that the judge revealed his bias in remarks made after the first trial, Ms. Gabor did not raise the argument until this appeal. This court has not yet "clearly defined the scope of our review of § 455 issues raised for the first time on appeal." McKethan v. Texas Farm Bureau, 996 F.2d 734, 744 n.31 (5th Cir. 1993), quoted in Mangum v. Hargett, 67 F.3d 80, 82 (5th Cir. 1995). Although a disqualification challenge raised for the first time on appeal is not per se untimely, the timeliness requirement of section 455 obligates a party to raise the disqualification issue "at a reasonable time in the litigation." United States v. York, 888 F.2d 1050, 1055 (5th Cir. 1989). Application of this standard is an additional bar to Ms. Gabor's argument; she failed to present her disqualification argument at a reasonable time in the litigation. See Stephenson v. Paine Webber Jackson & Curtis, Inc., 839 F.2d 1095, 1096 n.3 (5th Cir. 1988) (declining to consider the plaintiff's argument that the district judge, who had an attorney-client relationship with defense counsel, should have recused because "[p]laintiff has waived any objection by not raising it at an earlier stage of the litigation"); cf. Delesdernier v. Porterie, 666 F.2d 116, 122-23 (5th Cir. 1982) (declining to consider a

30

disqualification argument made under section 455(a) because the plaintiff raised the argument for the first time on appeal); York, 888 F.2d at 1056 (finding the defendant's post-trial motion for disqualification untimely because the defendant was aware of the grounds of the motion before the trial began).

Ms. Gabor's recusal argument, too little and too late, is rejected.

## VI.  Conclusion

We affirm the district court's judgment with respect to Ms. Gabor's liability for breach of contract.  We reverse the district court's award of $100,000 for breach of contract and render judgment in the amount of $57,500, with post-judgment interest from the date of the district court's judgment to the date it is paid, at the rate previously set by the district court, and the attorneys' fees awarded by the district court.

AFFIRMED IN PART AND REVERSED AND RENDERED IN PART.