# Supreme Court of Texas

No. 20-0396

Signature Industrial Services, LLC and Jeffry Ogden,

*Petitioners,*

v.

International Paper Company,

*Respondent*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

**Argued September 16, 2021**

JUSTICE BLACKLOCK delivered the opinion of the Court.

Justice Huddle and Justice Young did not participate in the decision.

The principal question in this breach-of-contract case is how to measure consequential damages. A jury found that the defendant breached by failing to pay $2.4 million as promised. The jury awarded the $2.4 million as direct damages, but it also added more than twenty times that amount in consequential damages. The plaintiff's primary theory of consequential damages was that the defendant's failure to pay the $2.4 million caused the abandonment of a deal in which the plaintiff

company would have been sold for $42 million. According to the plaintiff, its "company value" on the open market declined to zero after the breach. The court of appeals rejected this basis for consequential damages. 628 S.W.3d 541, 578 (Tex. App.—Corpus Christi–Edinburg 2020). It nevertheless accepted another theory under which a precipitous decline in the plaintiff company's "book value" following the breach authorized consequential damages of $12.4 million. *Id.* at 579.

In this Court, the plaintiff seeks reinstatement of the jury's award of $56.3 million in consequential damages, while the defendant argues that none of the proffered theories of consequential damages is valid. The parties also dispute the direct damages. Texas law requires that consequential damages be both (1) foreseeable at the time of contracting, and (2) calculable with reasonable certainty. *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 279 (Tex. 2015); *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998). Applying these bedrock principles of contract law, we conclude that neither the jury's award of $56.3 million nor the court of appeals' reduced allowance of $12.4 million can stand. A catastrophic decline in the plaintiff company's overall market value was not, at the time of contracting, a consequence of breach foreseeable to the defendant. Nor was a decline in the accounting measure of the plaintiff company's "book value" a reasonably certain way to measure its damages.

Because legally insufficient evidence supported the award of consequential damages and the plaintiff advances no valid theory of consequential damages in this Court, we render judgment against the plaintiff on that point. As for the direct damages, we affirm a portion of

2

the award. We also affirm the court of appeals' rejection of the defendant's indemnification claim and its rendition of judgment against co-plaintiff Jeffry Ogden. The judgment of the court of appeals is reversed in part and affirmed in part. Judgment is rendered consistent with this opinion, and the case is remanded to the district court for any further proceedings that may be necessary.

## I.    Background

Founded in 2010, Signature Industrial Services, LLC (SIS) performed maintenance, construction, and other tasks for International Paper Company (IP) and other industrial clients. SIS and IP contracted in March 2014 for SIS to upgrade a slaker—a large vessel that recycles chemicals used to make paper—at IP's mill in Orange, Texas. The initial agreement obligated IP to pay just over $775,000. Other costs could be billed to IP as they arose.

Following a series of delays and disputes, including a chemical spill that prevented work on the slaker, the cost of the project exceeded initial expectations. IP instructed SIS that it could complete the work and bill IP at the end. After SIS finished the work, the parties disputed the amount IP owed. IP thought its previous payment of $1.1 million would suffice, but SIS wanted another $2.4 million. The parties failed to reach an agreement.

SIS sued IP, alleging fraud and breach of contract. After litigation began, SIS submitted two invoices intended to cover the remaining $2.4 million it believed it was owed. Jeffry Ogden, SIS's President, intervened as a plaintiff in his personal capacity, raising essentially the same fraud and breach-of-contract claims as SIS.

3

Meanwhile, SIS had planned to be acquired by a third party, Primoris Services Corporation. Before litigation began, SIS received an offer from Primoris of $42 million. The negotiations were confidential. After IP refused to pay the amount SIS demanded, the negotiations between SIS and Primoris foundered. Facing a cash-flow crunch, SIS failed to fully pay its federal payroll tax, for which the IRS imposed penalties. The penalties led to more debt, and SIS then began to lose customers. Ogden, who had personally guaranteed much of SIS's debt, faced mounting financial difficulty. The company all but collapsed. The contract for work on the slaker was worth, at most, $3.5 million. SIS sued IP for $56.3 million.

Primoris made another offer to buy SIS after the lawsuit began. The offer price remained $42 million, though with less cash up front. SIS declined the offer. It later turned down two more offers, both for around $10 million.

At trial, an SIS expert witness testified about the company's lost value. The expert's testimony consisted of three components: the lost Primoris offer, the company's lost book value, and the tax penalties SIS incurred after its IRS trouble began. First, the expert calculated $42 million in damage to the company because, in his view, the $42 million Primoris offer was lost due to the breach. Second, he demonstrated that SIS's "book value" dropped by $12.4 million after the breach. He did this by looking at balance sheets from before and after the breach and subtracting SIS's liabilities from its assets to arrive at a bottom-line measure of its pre- and post-breach book value. He attributed the drop in book value to IP's non-payment, but he did not specifically analyze

4

any particular devalued asset or increased liability. Other witnesses testified that SIS lost contracting opportunities because of its precarious financial situation, which rendered the company's value "less than zero" by the time of trial. Finally, the expert opined that IP was responsible for $1.9 million in penalties incurred by SIS for non-payment of payroll taxes. The expert added the three figures—$42 million, $12.4 million, and $1.9 million—to arrive at a total damages figure of $56.3 million.

On SIS's breach-of-contract claim, the jury awarded the $56.3 million recommended by SIS's expert for "[d]amages to [SIS]'s company value." It also awarded $2.4 million in direct damages. The jury awarded identical amounts to SIS on its fraud claim. As for Ogden, the jury awarded a total of $4.2 million in breach-of-contract damages. It also awarded $63 million for mental anguish to Ogden on his fraud claim. All told, the jury awarded over $125 million due to IP's failure to pay $2.4 million. The district court rendered judgment for both plaintiffs on both the breach-of-contract and fraud claims.

The court of appeals reversed the district court's judgment as to all the fraud claims. As for SIS's breach-of-contract claim, the court of appeals reduced the consequential damages award from $56.3 million to $12.4 million, excising the damages for the lost $42 million sale and for SIS's tax penalties. The court of appeals upheld the $2.4 million in direct damages to SIS and $12.4 million in consequential damages for lost book value. It rendered judgment against Ogden on his breach-of-contract claim because it found he was not authorized to sue in his individual capacity for breach of a contract between SIS and IP. The court of appeals rejected IP's claim that SIS was contractually

5

bound to indemnify IP for its defense of Ogden's claims. 628 S.W.3d at 580.

All three parties petitioned for review in this Court. Neither SIS nor Ogden attempts to revive its fraud claim. SIS seeks reinstatement of $42 million in consequential damages, which it calculates based on the amount of Primoris's offer. IP argues that none of the consequential damages can stand, including the $12.4 million allowed by the court of appeals. IP also challenges the award of direct damages and contends that SIS is contractually obligated to indemnify IP for expenses incurred defending against Ogden's suit. Ogden seeks reinstatement of his breach-of-contract recovery. We address each of these issues in turn.

## II.    Consequential Damages

At issue are two proffered methods of calculating SIS's consequential damages. First is the decline in the company's market value from the $42 million offered by Primoris to the "less than zero" value proffered at trial. Second is the $12.4 million decline in book value testified to by SIS's expert and upheld by the court of appeals. SIS asks this Court to reinstate the former, while IP contends that neither can stand. As explained below, we agree with IP.

### A.    Legal Standards

Damages for breach of contract may include both direct and consequential damages. *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 373 (Tex. 2019). Direct damages often include restoration of "the benefit of a plaintiff's bargain." *Quigley v. Bennett*, 227 S.W.3d 51, 56 (Tex. 2007) (Brister, J., concurring). Consequential damages, on the other hand, compensate the plaintiff for

6

foreseeable losses that were caused by the breach but were not a necessary consequence of it.  *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998).[1]

From at least the time of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854), the widely recognized rule has been that consequential damages "are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach."  *Stuart*, 964 S.W.2d at 921. We call this requirement "foreseeability."  *Basic Cap. Mgmt., Inc. v. Dynex Com., Inc.*, 348 S.W.3d 894, 901 (Tex. 2011).  A foreseeable loss may either follow predictably from the breach "in the ordinary course of events" or arise from "special circumstances" that the party in breach "had reason to know."  *Id.* at 902.  A loss that is not the "probable" consequence of the breach, from the breaching party's perspective at the time of contracting, is not foreseeable.  *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981); *see also* 24 RICHARD A. LORD, WILLISTON ON CONTRACTS § 64:17 (4th ed.) ("Consequential damages include those damages that were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as the probable result of a breach.").

---

[1] *See also W. Union Tel. Co. v. McKinney*, 2 Willison 562, 566 (Tex. Ct. App. 1885) ("Ordinarily, such damages would not result from the breach of such a contract, and cannot, therefore, be said to be direct, natural and proximate; but are special and consequential, and such as are recoverable only where the party breaching the contract had notice, when he made the contract, of the facts which would render such damages reasonably probable in the event of a breach.").

7

Apart from foreseeability, consequential damages must also be "proved with reasonable certainty." *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 278 (Tex. 2015). "Proof need not be exact, but neither can it be speculative." *Id.* The losses must be "susceptible of being established by proof to that degree of certainty which the law demands." *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938). If a loss was "too remote and depended upon too many contingencies, and was too speculative in its character to have authorized its reception as evidence of any specific and certain loss," *Hope v. Alley*, 9 Tex. 394, 395 (1853), then it cannot be recovered. The reasonable-certainty rule acknowledges the limited competence of courts to track the complex effects of a breach of contract in an interdependent marketplace. Parties must prove damages such that courts and juries can discern the extent of the losses actually caused by the breach, rather than by other factors. Thus, we have called on parties to provide "objective facts, figures, or data" to show their lost profits and other consequential damages. *Phillips*, 475 S.W.3d at 279.

"The proper measure of damages is a question of law," which we review *de novo*. *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Int'l-Great N.R. Co. v. Casey*, 46 S.W.2d 669, 671 (Tex. Comm'n App. 1932, holding approved). If the legal theories underlying the damages awarded do not conform to the law governing damages, we may reverse the award as a matter of law. *Whiteside v. Trentman*, 170 S.W.2d 195, 196 (Tex. 1943).

We may also reverse an award if the evidence of damages was legally insufficient. "In evaluating legal sufficiency, we are required to

determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994). We "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).

## B. Damages for the Company's Lost Market Value

Prior to the breach, SIS confidentially negotiated its sale to Primoris for $42 million. It is undisputed that IP knew nothing about the pending sale to Primoris when it agreed to the slaker contract. As a result, the loss of the deal cannot have been a foreseeable consequence of the breach. This is so even if SIS could show that the breach caused the deal to collapse. Foreseeability is an independent element of any claim for consequential damages. *Basic Cap.*, 348 S.W.3d at 901. Even if caused by the breach, damages are not recoverable if they were not within the breaching party's reasonable contemplation at the time of contracting. *Stuart*, 964 S.W.2d at 921. Because of IP's undisputed lack of awareness of the Primoris deal at the time of contracting, the court of appeals rejected the lost $42 million sale as a basis for consequential damages. 628 S.W.3d at 578.

In this Court, SIS acknowledges that the loss of the Primoris sale was not itself foreseeable to IP. SIS instead defends the $42 million award as a measurement of lost "company value" rather than as

9

damages for loss of the Primoris deal.[2]  SIS contends the jury measured its lost "company value" as the difference between the price offered by Primoris ($42 million) and the company's market value at the time of trial ("less than zero," according to witnesses).  After framing the award in this way, SIS asks us to assess whether the decline in the company's market value—not loss of the sale itself—was a foreseeable consequence of the breach.  As explained below, we conclude that it was not.

To begin with, the court of appeals was justified in rejecting SIS's argument that the $42 million lost Primoris sale is sufficient evidence of a decline in company value of $42 million or more.  This is so for several reasons.  First, the jury awarded the entire amount of the Primoris offer (and more), not the difference between the highest offer and subsequent, post-breach offers.  A company does not lose all its value by forfeiting one sale opportunity, particularly when the record reflects later offers.  Second, treating the $42 million as reflecting a decline in the company's market value would render duplicative the $12.4 million in lost book value, which the jury awarded on top of the $42 million.  Third, SIS cannot use the $42 million sale price to estimate its pre-breach value and then use expert testimony on book value to estimate its post-breach value.  Market value and book value are not interchangeable measures.[3]

---

[2] The jury charge instructed the jury to measure "damages to Signature's company value that were the natural and probable consequence of the failure to comply and that were foreseeable when the agreement was made."

[3] *City of Harlingen v. Est. of Sharboneau*, 48 S.W.3d 177, 187 (Tex. 2001) (Baker, J., concurring in the judgment) ("Market value is the price the property would bring 'when it is offered for sale by one who desires, but is not obligated

10

SIS nevertheless asks us to consider the entire consequential damages award of $56.3 million as reflecting a decline in its market value and to view the lost Primoris sale merely as some evidence of that value. This way of understanding the jury's award is consistent with the jury charge, which instructed the jury to award "damages to Signature's company value that were the natural and probable consequence of the failure to comply and that were foreseeable when the agreement was made." Even assessing the award on those terms, however, the damages awarded cannot stand because they were not "foreseeable when the agreement was made."

Again, "[f]oreseeability is a fundamental prerequisite to the recovery of consequential damages for breach of contract." *Basic Cap.*, 348 S.W.3d at 901. To establish the foreseeability of the damages it seeks, SIS must prove that IP "contemplated at the time" it agreed to the slaker contract that a catastrophic collapse in SIS's market value far outpacing the $2.4 million IP refused to pay "would be a probable result of the breach." *Stuart*, 964 S.W.2d at 921; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 351. It has not done so.

to sell, and is bought by one who is under no necessity of buying it.'") (quoting *State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992)); JEFFREY J. HAAS, CORPORATE FINANCE 74 (2d ed. 2021) ("Book value (BV) is the simplest valuation method because it is derived directly from the numbers on the company's balance sheet. The book value of a company on any given date is simply the value of its total assets (TA) *less* the value of its total liabilities (TL), both as reported on the balance sheet on that date. In other words, book value is the amount of the company's assets that would be left after the company's creditors are paid off in full. Thus, book value is also known as 'shareholders' equity.'"); *see id.* at 24 (noting that the balance sheet approach "is limited" because it "requires the omission of the current fair values of most assets and liabilities").

11

SIS attempts to show its collapse was foreseeable to IP by demonstrating that IP knew SIS needed payments on the slaker contract to fund future business opportunities. SIS relies on our decision in *Basic Capital*, in which we held that damages for lost business opportunities were foreseeable on the facts of that case. *Basic Cap.*, 348 S.W.3d at 903. In *Basic Capital*, the contract was for loans to fund specific capital investments by the plaintiff. The nature of the contract thus made it clear that withholding payment would impair the plaintiff's anticipated investments. *Id.* We concluded that the plaintiff need not prove that the details of each lost real estate venture were known to the defendant at the time of contracting. Because the defendant "clearly knew how the [money] would be used," the plaintiff did not need to establish that the particulars of each lost opportunity were known to the defendant at the time of contracting in order for the lost profits predictably flowing from the breach to be recovered as consequential damages. *Id.*

Unlike in *Basic Capital*, however, SIS does not seek compensation for the loss of specific business opportunities. Recovery of the lost profits flowing from lost business opportunities, as in *Basic Capital*, has long been recognized as a valid theory of consequential damages. *Phillips*, 475 S.W.3d at 278–79 (detailing the standards governing awards of lost profits). Instead of travelling the well-worn path—calculating the profits it would have made from the business it lost due to IP's breach— SIS pursued a novel damages model premised on a decline in the company's overall market value as an asset. But SIS cites no contract case in which a court has upheld an award of consequential damages

premised on a drop in a company's market value as an asset.[4]  The few Texas courts that have addressed the question have not allowed such a recovery.[5]  This case will not be the first.

---

[4] The cases cited by SIS do not support an award of consequential damages for reduced company value in a breach-of-contract case.  In *Sawyer v. Fitts*, 630 S.W.2d 872 (Tex. App.—Fort Worth 1982, no writ), the court allowed loss-of-value damages in a tort suit, although—unlike here—the lost value had been realized by a transaction that locked in the plaintiff's actual losses.  The same was true for *Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555 (S.D. Tex. 2011), *aff'd*, 716 F.3d 867 (5th Cir. 2013), also a tort case.  Whether a decline in a company's market value could ever be an appropriate measure of damages in a tort suit is a question we do not address.  SIS cites one contract case involving lost-value damages, *R.G. McClung Cotton Co. v. Cotton Concentration Co.*, 479 S.W.2d 733 (Tex. App.—Dallas 1972, writ ref'd n.r.e.).  There, however, the devalued asset at issue was a commodity, not a company.  The defendant delayed delivery of cotton, and the price dropped during the delay.  The subject of the contract was the fluctuating commodity itself, and the court allowed the breaching defendant to be charged with the decline in market value during the delay in delivery.  The case does not mention foreseeability.  In any event, charging cotton dealers with knowledge of the cotton market is a far cry from charging IP with knowledge of the market for buying and selling companies like SIS.

[5] *Transitional Entity LP v. Elder Care LP*, No. 05-14-01615-CV, 2016 WL 3197160, at *8 (Tex. App.—Dallas May 27, 2016, no pet.) (reversing an award that "appear[ed] to compensate appellees for the loss in value of a business" rather than basing damages on the benefit of the bargain); *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 761 (Tex. App.—El Paso 2000, no pet.) (agreeing that lost value was an inappropriate measure and distinguishing lost profits from lost value); *Nelson v. Data Terminal Sys., Inc.*, 762 S.W.2d 744, 747–48 (Tex. App.—San Antonio 1988, writ denied) ("DTS contends that diminution of value in support of Nelson's breach of contract cause of action is not a proper measure of damages.  We agree with DTS . . . ."); *see also Robehr Films, Inc. v. Am. Airlines, Inc.*, 85 CIV. 1072 (RPP), 1989 WL 111079, at *5 (S.D.N.Y. Sept. 19, 1989) ("Under Texas law, damages for diminution in value of a business are not recoverable in a breach of contract action, but are only recoverable in tort."), *aff'd*, 902 F.2d 1556 (2d Cir. 1990); *cf. Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 214 (5th Cir. 1998) ("Under Texas law, the loss of goodwill or business reputation is not

13

It stands to reason that losing business opportunities will often contribute to a decline in a company's market value, but whether this will be the case—and to what extent—depends on many factors typically beyond the reasonable contemplation of the breaching party. The market for ownership of a business is distinct from the market the business serves. *See* Henry G. Manne, *Mergers and the Market for Corporate Control*, 73 J. POL. ECON. 110, 112 (1965). Dense volumes detail the proper way to value companies. *See, e.g.*, TIM KOLLER ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES (7th ed. 2020). Students in business schools (and increasingly in law schools) ponder asset pricing models and formulas for calculating the weighted average cost of capital. Peter H. Huang & Michael S. Knoll, *Corporate Finance, Corporate Law and Finance Theory*, 74 S. CALIF. L. REV. 175, 175–76 (2000). Despite detailed knowledge of their own industry, companies often do not understand the market for buying and selling companies like themselves, much less companies in other lines of work. As a result, specialized bankers and consultants are frequently hired when companies have reason to explore either their own market value or that of other companies.

SIS proffered no evidence that IP ever had any reason to concern itself with SIS's market value in the eyes of those, like Primoris and its advisors, who buy and sell companies. That alone renders SIS's lost market value unforeseeable to IP and therefore unrecoverable. Yet even if IP knew SIS's market value at the time of contracting, foreseeing the

recoverable in a breach of contract action."); *Sterling Projects, Inc. v. Fields*, 530 S.W.2d 602, 605 (Tex. Civ. App.—Waco 1975, no writ) (same).

impact of breaching a promise to pay on a company's market value is at least as difficult as valuing the company in the first place. When valuing a business, "confounding events may be hard to disentangle." FRANK H. EASTERBROOK & DANIEL R. FISCHEL, THE ECONOMIC STRUCTURE OF CORPORATE LAW 193 (1996). Isolating the impact of the breach of contract from other factors contributing to investors' reduced interest in a company will rarely be an easy task.

The law does not charge contracting parties with a duty to understand how their actions will affect the counterparty's market valuation. SIS points to no authority to the contrary, and we are aware of none. We do not expect contracting parties, regardless of their sophistication, to study the market for acquiring their counterparties before entering into a contract or breaching one. As a general rule, neither the counterparty's market value nor the impact of breach on that value will be reasonably foreseeable at the time of contracting. SIS offered no evidence distinguishing IP from this general rule. It attempted to show that IP was intimately familiar with SIS's business because of the companies' close relationship. But again, knowledge of a business is not the same as knowledge of the market for buying and selling that business.[6]

As we said in *Basic Capital*, "a general knowledge of a prospective borrower's business does not give a lender reason to foresee the probable results of its refusal to" perform. 348 S.W.3d at 902. In other words, a

---

[6] Even companies that know the market for buying and selling businesses will generally have no duty to investigate or foresee the market value of companies with which they contract, provided that the contract itself is not concerned with the market value of the counterparty.

15

party's mere familiarity with another company does not alone make the collapse of that company a foreseeable consequence of breach. *Id.* at 901–02. The same is true here. IP's familiarity with SIS's business did not make SIS's precipitous decline in attractiveness to buyers a foreseeable consequence of breach.

SIS contends that, beyond general familiarity, IP was specifically aware that SIS needed speedy payment to fund future business and that an unexpected cash-flow crunch could be devastating to SIS. The only evidence SIS offered on this point was (1) the parties' longstanding familiarity with one another, (2) the fact that IP's employees *later* learned of SIS's financial distress, and (3) the assertion that construction is a "gossipy-type industry." Even assuming that SIS established IP's knowledge of SIS's precarious financial position, that does not make the effect of breach on SIS's *market value* foreseeable. As in *Basic Capital*, one traditional measure of consequential damages is lost profits, which must be established with reasonable certainty. 348 S.W.3d at 898, 901. SIS could have sought such damages, but it chose not to. Instead, it laid its overall decline in market value—not the discrete injuries that caused its market value to decline—at IP's feet. But even if IP should reasonably have foreseen that its breach would cost SIS a great deal of business, SIS's decline in market value is a fundamentally different matter. Damages for that loss were unforeseeable and therefore unavailable.[7]

---

[7] In addition to arguing foreseeability, IP also argues that "company value" damages are not available as a matter of law because they reflect "paper losses" in SIS's theoretical market value, not actual cash losses suffered by the time of trial. *See* DAN B. DOBBS & CAPRICE L. ROBERTS, LAW OF REMEDIES

16

Parties need not scour the balance sheets of their counterparties and weigh the likely consequences of breach on the counterparty's attractiveness to investors.[8] Far from helping new and unstable

§ 3.4 (3d ed. 2018) (explaining that "consequential losses must have been realized or must be likely to be realized in the future" to be recoverable, so "bookkeeping losses do not count when it comes to consequential damages"). Because we reverse the award for lack of foreseeability, we do not consider whether the damages suffer from this additional defect. We also do not consider another potential bar to "company-value" damages. IP argued in the court of appeals that SIS could never recover for its decline in market value because those losses were suffered by the company's owners, not by SIS itself. Unlike withholding payment to SIS on the slaker contract, which harms SIS itself, a deterioration in SIS's value as an asset harms those who hold the asset—so the argument goes. After all, it is SIS's owners, not SIS itself, who would be paid by a buyer like Primoris if SIS were sold. If this argument is correct, then SIS itself was ineligible to seek recovery for a decline in its market value, and the eligible entities—SIS's owners—were not parties to the slaker contract and therefore could not sue for its breach. But IP does not press this argument here, so we do not consider it.

[8] Of course, parties can give notice of their dire financial straits at the time of contracting. *See, e.g.*, *W. Union Tel. Co. v. Brooks*, 279 S.W. 443, 444 (Tex. 1926). When one party has given notice of the consequences of breach at the time of contracting, no further inquiry into the foreseeability of those consequences is required. *Elijah Ragira/VIP Lodging Grp., Inc. v. VIP Lodging Grp., Inc.*, 301 S.W.3d 747, 756 (Tex. App.—El Paso 2009, pet. denied) ("[I]f the special circumstances under which the contract was actually made were *communicated by the plaintiffs to the defendants*, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated.") (emphasis added) (quoting *Hadley*, 9 Exch. at 354–55); RESTATEMENT (SECOND) OF CONTRACTS § 351 cmt. b ("If loss results other than in the ordinary course of events, there can be no recovery for it unless it was foreseeable by the party in breach because of special circumstances that he had reason to know when he made the contract."). Relying on this rule, a party in SIS's position could give notice of its pending sale and of its expectation that a breach would scuttle the sale and drive its company's value into the ground, thereby resulting in losses far exceeding the size of the contract. Whether anyone would contract with such a company is

businesses like SIS, such a rule would encourage parties to contract only with large, established companies. Few rational parties would contract with a fledgling company for whom a $2.4 million non-payment might one day be worth $56 million in "company value" damages.

In sum, the decline in SIS's market value reflected in the jury's award was not foreseeable to IP and was therefore not available as consequential damages. We affirm the court of appeals' reversal of $42 million of the award on foreseeability grounds. The court of appeals left in place $12.4 million of the award, to which we now turn.

## C.      Damages for the Company's Lost Book Value

The jury was instructed to measure the "[d]amages to Signature's company value."[9] It awarded over $56 million. The court of appeals concluded that $12.4 million of that amount was supported by legally sufficient evidence. 628 S.W.3d at 579. The $12.4 million upheld by the court of appeals was derived from the calculations of SIS's expert, who testified that SIS's "book value" declined by $12.4 million as a result of the breach.

While book value serves a purpose in accounting, we conclude that a drop in book value, without more, cannot support an award of consequential damages for breach of contract. Again, consequential

---

another matter. And whether bars other than foreseeability would foreclose such damages is a question we do not address.

[9] The jury charge did not define "company value." To the extent "company value" is understood to mean market value, we have already explained why a decline in SIS's market value was unforeseeable and therefore unrecoverable. To the extent "company value" could refer also to "book value," we will separately address the court of appeals' allowance of $12.4 million in "book value" damages.

damages must be "proved with reasonable certainty." *Phillips*, 475 S.W.3d at 278. SIS's use of book value as a damages measure fails to satisfy this requirement. The jury was asked to rely on SIS's bottom-line book value without analysis of specific items on the balance sheet. SIS's expert testified that before the breach, in December of 2013, the company had a book value of $3,322,442. After the breach, in March of 2016, that value was underwater by $9,109,059. The difference between those two numbers is the $12.4 million upheld by the court of appeals. We cannot agree that SIS proved losses of $12.4 million with the requisite reasonable certainty.

To begin with, SIS seems to have used book value as a proxy for the value of the company as an asset, i.e., its market value. But "[b]ook value and market value are not the same." *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 785 (Tex. 2020). In *Pike*, the plaintiff tried to demonstrate the value of an interest in a partnership by showing the book value of its cement plant. *Id.* We rejected the evidence as insufficient to show the actual loss in value suffered because the book value of the asset is not its fair market value. *Id.* at 784. Instead, book value is "simply the value of [a company's] total assets . . . *less* the value of its total liabilities"—that is, "the amount of the company's assets that would be left after the company's creditors are paid off in full." HAAS, CORPORATE FINANCE 74. It is an accounting concept, the decline of which does not necessarily reflect actual losses to the company.

Merely demonstrating a decline in book value, as did SIS's expert, does not prove any actual losses—with reasonable certainty or otherwise. For this reason, Texas courts have long rejected the use of

19

book value as a measure of damages. "Book value is entitled to little, if any, weight in determining the value of corporate stock, and many other factors must be taken into consideration." *Bendalin v. Delgado*, 406 S.W.2d 897, 900–01 (Tex. 1966). Several court of appeals decisions similarly criticize attempts to use book value as a proxy for the value of a company to its owners.[10] We see no reason to depart from these precedents. As an accounting measure, book value has its uses. But the aggregate number itself offers only a limited, big-picture view of the company's financial situation. It tells the jury nothing about the underlying losses actually suffered by the company that contributed to the drop in book value, and it tells the jury nothing about the overall decline in the market value of the company as an asset. The $12.4 million in book-value damages upheld by the court of appeals must be reversed.

\* \* \*

SIS has not sought to recover lost profits as an alternative measure of consequential damages, nor has it offered evidence to support such a recovery. In some past cases where a "charge failed to instruct the jury on the proper measure of . . . damages," we have "remand[ed] . . . for a new trial" so long as there was "some evidence"

---

[10] *Bhatia v. Woodlands N. Hous. Heart Ctr., PLLC*, 396 S.W.3d 658, 667 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("Book value is an improper method for determining the value of [a business] because such values are mere arbitrary entries in a ledger."); *Mandell v. Mandell*, 310 S.W.3d 531, 537 (Tex. App.—Fort Worth 2010, pet. denied) ("Book value has limited application, if any, in determining the value of . . . a small, closely held corporation."); *Lee v. Hersey*, 223 S.W.3d 439, 448 (Tex. App.—Amarillo 2006, pet. denied) ("[F]inancial statements . . . provide no probative evidence of market value . . . .").

that could support a specific amount of damages based on valid criteria. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997); *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010) (remanding because "competent evidence exists to establish *some* reasonably certain amount of lost profits" other than the amount awarded). If, however, no evidence supports lost profits under a proper theory, we have rendered judgment. *See Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 866 (Tex. 2017) (rendering a take-nothing judgment when the evidence was legally insufficient to establish lost profits with the requisite certainty). Here, SIS did not establish with reasonable certainty the size of any particular lost profits. It sought only the recovery of its overall loss in company value, and such damages were unavailable for the reasons explained above. Any evidence in the record regarding the amount of specific lost profits is scantier than what we rejected in *Horizon Health*. *Id.* at 860–64. Accordingly, we affirm the court of appeals' judgment rejecting the $42 million damages for lost market value and reverse its judgment upholding damages based on a decline in book value. We render judgment that SIS take nothing on its claim for consequential damages.

### III.   Direct Damages

IP also appeals the award of direct damages, which the court of appeals affirmed. The jury awarded $2.4 million in direct damages, which reflect the difference between what IP paid and the amount SIS claimed IP owed. The court of appeals reviewed all the evidence and determined that it could not say there was legally insufficient evidence for the full $2.4 million award. 628 S.W.3d at 576–77. IP attacks two

21

discrete portions of the direct damages award, which are reflected in two invoices totaling around $1.2 million.

Invoice #1200-6087 shows $622,560.61 in charges to IP for (1) overhead, (2) tax penalties, and (3) lost revenue due to non-payment. IP contends these charges are prohibited by the contract and are therefore unrecoverable as a matter of law. *See Wade & Sons, Inc. v. Am. Standard, Inc.*, 127 S.W.3d 814, 824 (Tex. App.—San Antonio 2003, pet. denied). We agree.

First, the contract prohibited SIS from billing IP for the "[w]ages of any employee in [SIS's] home office or any employee not directly employed on th[is] Project," "[i]nterest on capital employed either in plant or in expenditures on the Project," or "[o]verhead or general expenses of any kind." The invoice charged for back-office staffing costs as well as time that management spent meeting with IP about the project, not for labor on the slaker project itself. These are plainly "overhead or general expenses of any kind," so the contract forbids SIS from charging IP for those costs. Second, the contract made SIS responsible for "pay[ing] . . . any tax or contribution required by any applicable Federal, State or local laws." As a result, the tax penalties reflected on the invoice were not chargeable to IP. Third, the invoice's charge for "lost revenue . . . due to the loss of work from non-payment and suit" would be a matter of consequential damages, not direct payment under the contract.

None of the charges reflected in Invoice #1200-6087 is allowed by the contract. SIS has offered no substantive defense of these charges beyond the assertion that the jury could consider all the invoices and

22

arrive at this damages award. And the court of appeals never addressed whether the contract expressly barred the items in Invoice #1200-6087, despite IP's arguments to that effect. We conclude that the parties' agreement precludes these charges, and it is undisputed that the direct damages award includes the full amount of this invoice. The direct damages must be reduced by the amount of the invoice, $622,560.61.

Invoice #1200-6088 sought $647,309.93 to compensate SIS for the "cost of management and field labor," "materials," and "equipment . . . not previously billed to [IP]." The contract makes these expenses chargeable to IP. Moreover, a separate contract between the parties allows for the charges listed, and the court of appeals correctly determined that the jury was allowed to consider that contract as well. 628 S.W.3d at 576.

IP argues that because the parties had agreed to negotiate regarding what portion of the costs IP would pay, IP cannot be liable for the full amount of the invoice. But the conclusion does not follow from the premise. The parties did agree to negotiate if disputes arose, but that does not render ephemeral IP's promise to pay amounts it owed. The agreement to negotiate did not preclude the jury from finding that IP owed the full amount of the invoice. We conclude that sufficient evidence supported the jury's conclusion that IP owed SIS the amounts reflected in this invoice. *City of Keller*, 168 S.W.3d at 810.

When a lump-sum damages award contains both compensable and non-compensable damages, we have remanded the entire award for retrial based only on the compensable portion. *County of Bexar v. Santikos*, 144 S.W.3d 455, 464 (Tex. 2004). Here, however, we have

concluded as a matter of law that IP did not breach the parties' contract by failing to pay Invoice #1200-6087, and it is undisputed that the jury awarded SIS damages for the full amount of that invoice—$622,560.61—as part of its award of direct damages for contract breaches. Because SIS cannot legally recover these damages, which are cleanly excisable from the total award, we render judgment reducing the award of direct damages by this amount. *See* TEX. R. APP. P. 60.2(c) (permitting the Supreme Court to render the judgment that a lower court should have rendered); *Barker v. Eckman*, 213 S.W.3d 306, 310 (Tex. 2006) (affirming reduction in damages award for contract breaches where recovery for some breaches was legally barred by limitations and amount of damages awarded for each breach was undisputed).

## IV. Indemnification

IP claims that SIS must indemnify it for expenses incurred defending the suit brought by Ogden. The court of appeals disagreed. We affirm, but for a different reason than the court of appeals.

The contract requires SIS to indemnify IP for its defense costs if "any person makes a claim" for "damage or injury of any kind" that is "caused by, resulting from, arising out of, or occurring in connection with the performance by [SIS]" of the contract.[11] The indemnity provision

---

[11] The relevant provision reads:

6. Indemnity. [SIS] assumes the defense and the entire responsibility and liability for any and all damage or injury of any kind or nature (including resulting death) to all persons, whether employed by [SIS] or otherwise, including but not limited to (a) employees and agents of subcontractors of [SIS] or [IP], or (b) any other third party, and to all property (other than the work itself as set out in paragraph 7 below) caused by, resulting from, arising out of, or occurring in connection with the performance by [SIS], or any subcontractor or agent of [SIS], of this AGREEMENT. In the event the liability of [SIS] shall

24

has an exception, however, for when liability "arise[s] by reason of the sole negligence of [IP]." In such cases, SIS "shall not be liable."

The court of appeals understood the "sole negligence" exception to cover this case because the case involves only alleged wrongdoing by IP and no wrongdoing on the part of SIS. That was error. Under the language chosen by the parties, the exception is triggered when liability arises by reason of IP's *negligence*, not its breaches of contract. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex. 1991) (distinguishing negligence and breach of contract). The alleged liability in this case does not arise from any form of negligence at all. Ogden sued IP for breach of contract and fraud, not negligence. The indemnity clause's "sole negligence" exception therefore has no application.

The result should nevertheless be affirmed. The Insurance Code forbids certain construction contracts from requiring an indemnitor to indemnify an indemnitee for "a *claim* caused by the . . . fault . . . *or the breach of contract* of the indemnitee." TEX. INS. CODE § 151.102 (emphasis added).[12] Because Ogden's claims complain of IP's fraud and

---

arise by reason of the sole negligence of [IP], then and only then, [SIS] shall not be liable under the provisions of this paragraph. If any person makes a claim for any such damage or injury (including death resulting therefrom) as hereinabove described, [SIS] agrees to indemnify and save harmless [IP], its agents, servants and employees from and against any and all loss, damage, injury or expense including reasonable attorney's fees that [IP] may sustain as a result of any such claims . . . .

[12] This subchapter of the Insurance Code applies to construction contracts for "project[s] for which . . . indemnitor[s]" are "provided or procure[] insurance subject to" Chapter 151 or Title 10. TEX. INS. CODE § 151.101(a). SIS has consistently argued that section 151.102 applies to the slaker contract, and IP has never suggested that the statute does not cover the agreement.

breach of contract, we conclude that the statute renders the indemnity agreement ineffective to the extent it would require SIS to indemnify IP against Ogden's suit.

IP argues that Ogden's injuries were actually "caused by" SIS's wrongdoing —its failure to pay payroll taxes—rather than by IP's fraud or breach of contract. IP may be correct that the true cause of Ogden's personal liability and the follow-on harms to his credit and reputation was SIS's failure to pay taxes. But we do not understand section 151.102 to ask who is truly at fault for the injuries complained of. Instead, it asks only whether the "claim" for which indemnity is sought was "caused by" the fault or breach of contract of the indemnitee. *See Union Pac. R.R. v. Brown*, No. 04-17-00788-CV, 2018 WL 6624507, at \*5 (Tex. App.—San Antonio Dec. 19, 2018, no pet.) (requiring the indemnitee to identify pleadings alleging its liability for the fault of the indemnitor).

Here, no one disputes that the "claim" is Ogden's suit alleging fraud and breach of contract due to IP's refusal to pay under the slaker contract. For purposes of the anti-indemnity statute, IP's alleged breach—which IP no longer disputes—was the cause of Ogden's claim, regardless of whether SIS's actions were also part of what truly brought about the injuries alleged by Ogden. The statute does not require factual inquiry into the "true" cause of the plaintiff's injuries. Absent fraud or some other unusual circumstance not present here, examining the pleadings will generally be a sufficient basis to determine whether

Because no party argues otherwise, we will assume section 151.101(a) applies to the agreement.

26

the "claim" was "caused by" the fault or breach of contract of the party seeking indemnification.  TEX. INS. CODE § 151.102.

## V.    Ogden's Claims

Jeffry Ogden, SIS's President, also sued IP in his individual capacity for fraud and breach of contract.  He received a $67 million award.  The court of appeals reversed the award in its entirety and rendered judgment against Ogden, holding that the elements of fraud were not met and that Ogden had no right to sue on the contract between SIS and IP.  628 S.W.3d at 580–81.  Ogden challenges the court of appeals' decision only with respect to his breach-of-contract claim.  We affirm.

Ogden was neither a party to the contract nor in privity with one. He sued under two theories—assignment and agency—that he claims allow him to personally recover against IP for breach of a contract between IP and SIS.  Both theories fail.

First, Ogden argues that SIS assigned the right to sue under the contract to him.  But the contract has a non-assignment clause.  Such clauses are enforceable.  *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 556 (Tex. 1986).  Even if there were no such clause, Ogden has not pointed to any words or actions by SIS that demonstrate an intent to assign the contract to him.  If anything, SIS demonstrated its intent *not* to assign its rights by suing to enforce the contract on its own.

Second, Ogden argues that, as an agent of SIS with an interest in the contract, he can sue for breach.  The law does not support Ogden's agency theory.  In *Tinsley v. Dowell*, 26 S.W. 946, 948 (Tex. 1894), we

27

held that the "general rule is that one who contracts as agent cannot maintain an action, in his own name and right, upon the contract." We recognized four narrow exceptions: (1) "where the agent contracts in his own name"; (2) "where the agent does not disclose his principal"; (3) "where the agent is authorized to act as owner of the property" by "the usages of trade"; and (4) "where the agent has an interest in the subject-matter of the contract." *Id.* In that case, Dowell had attempted to sue on his principal's land-sale contract. We held that his only interest in the contract was a percentage of the proceeds, but the subject-matter of the contract was the land itself. When Tinsley breached by failing to purchase the land, Dowell had no right to sue on the contract. *Id.* at 949.[13]

Ogden has not shown that any of the exceptions articulated in *Tinsley* apply here. The jury found that Ogden had an "interest" in the subject-matter of the contract, but this is unsupportable as a matter of law.[14] The subject of the contract was work by SIS and payment by IP, which was owed to SIS alone. Ogden's hope that SIS would be paid and would in turn pay off tax debt he had guaranteed is not a legally

---

[13] *See also Cavaness v. Gen. Corp.*, 283 S.W.2d 33, 37 (Tex. 1955) (noting that an agent's personal ownership of the patent rights in a licensing contract "would be the kind of personal interest contemplated by the rule"); *Harper v. Welchem, Inc.*, No. C14-91-00627-CV, 1992 WL 198620, at *2 (Tex. App.— Houston [14th Dist.] Aug. 20, 1992, writ denied) (rejecting a plaintiff's claims for lack of an "*in rem* interest" or other interest in the contract "adequate for the purposes of the fourth *Tinsley* exception").

[14] Unless underlying material facts are in dispute and therefore require resolution by a jury, the question of whether a party has an interest in the subject-matter of another party's contract sufficient to allow him to sue on the contract will be a question of law for the court.

cognizable "interest in the subject-matter of the contract" sufficient to authorize Ogden to sue in his personal capacity for injuries to his company. The jury may have mistakenly found otherwise based on a colloquial understanding of the word "interest." But Ogden had no more legal interest in the slaker contract than any other officer of a closely held company has in his company's contracts. To hold that he can sue for breach of SIS's contracts in his personal capacity would collapse the distinction between corporate entities and their individual owners or officers. Ogden cites no authority supporting such an outcome.

In any event, Ogden cites no case in which an individual with an interest in a contract has been permitted to sue as an agent or assignee when the principal is already suing on the same contract for the same breach. The resulting duplicative litigation and double recovery are self-evidently inappropriate. We affirm the court of appeals' rendition of judgment against Ogden.

## VI. Conclusion

The judgment of the court of appeals is affirmed in part and reversed in part. Judgment is rendered that SIS take nothing on its claim for consequential damages. Judgment is rendered reducing SIS's recovery of direct damages by $622,560.61. As for IP's claim for indemnity, the judgment of the court of appeals is affirmed. The court of appeals' rendition of judgment that Ogden take nothing is likewise affirmed. The case is remanded to the district court for any further proceedings that may be necessary.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** January 14, 2022